UNITED STATES, Appellant

v

EDWIN L. CULP, Private First Class,
U. S. Marine Corps, Appellee

14 USCMA 199, 33 CMR 411

No. 16,906

September 5, 1963

*Major Elvin R. Coon, Jr.,* USMC, argued the cause for Appellant, United States. With him on the brief was *Commander Benjamin H. Berry,* USN.

*Lieutenant Colonel John L. Ostby,* USMC, argued the cause for Appellee, Accused. With him on the brief were *Captain Charles Timblin,* USN, and *Lieutenant (jg) Harold C. Donegan,* USNR.

*Lawrence Speiser, Esquire,* argued amicus curiae. With him on the brief were *Joseph S. Lobenthal, Jr., Esquire,* and *Melvin L. Wulf, Esquire.*

*Lieutenant Colonel Emanuel Lewis,* USAF, on brief amicus curiae.

*Lieutenant Colonel Francis M. Cooper, Captain Jerome Nelson, First Lieutenant Robert T. Webster,* and *First Lieutenant Thomas E. Towe,* U. S. Army, were on brief amicus curiae.

## Opinion

KILDAY, Judge:

The accused was tried by a special court-martial convened at Bainbridge, Maryland, by the Commanding Officer, Service School Command, United States Naval Training Center. Upon his plea of guilty "to the charge" which contained six specifications of larceny, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921, he was convicted and sentenced to be discharged from the service with a bad-conduct discharge, to be confined at hard labor for four months, to forfeit $50.00 per month for four months, and to be reduced to pay grade E-1. The sentence was approved by the convening authority and the supervisory authority.

The record reflects that the accused is a young man of superior mental attainments. He graduated sixteenth in his high school class of 69. After entering the Marine Corps he made an outstanding record in both conduct and proficiency. After one year of service he was recommended by his superiors for assignment to the Naval Preparatory School to compete for admission to the Naval Academy. He was admitted to the Preparatory School and the offenses here involved, to which he confessed, concern six occasions upon which he stole, from comrades at the school, sums of money ranging from 90¢ to $50.00.

The order appointing the special court-martial designated two naval officers as trial counsel and two naval officers as defense counsel. None of the four so assigned was certified in accordance with Article 27, Uniform Code of Military Justice, 10 USC § 827.

After approval by the convening authority and the supervisory authority, the case was reviewed by a board of review in the office of The Judge Advocate General of the Navy. The board of review determined the plea

200

of guilty to be improvident, and that the record contained cumulative error. In addition, the board held that the accused was entitled as a matter of right, under the Sixth Amendment to the Constitution, to counsel qualified in the law unless such right was competently and intelligently waived by him. Whereupon the board stated: "Accordingly, the findings of guilty and the sentence as approved on review below are set aside. A rehearing may be ordered."

Pursuant to Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, The Judge Advocate General of the Navy has certified the case to this Court on the following issues:

1. Was the board of review correct in holding that the accused was entitled, as a matter of right, under the Sixth Amendment to the Constitution of the United States, to counsel qualified in the law unless such right was competently and intelligently waived by him?

2. If the answer to the first certified question is in the affirmative, in a trial by special court-martial does military due process demand that "counsel qualified in the law" be qualified in the sense of Article 27 (b), Uniform Code of Military Justice?

The board of review having authorized a rehearing, in my opinion, review is necessary as guidance in the event thereof.

Before proceeding to the questions presented, preliminary remarks on four subjects seem pertinent. These are: (1) Whether it was necessary for the board of review to proceed to a determination of the constitutional question posed; (2) the necessity for this Court to make a determination of that constitutional question; (3) the position of an accused before a court-martial vis-a-vis a defendant before a civilian court; and (4) the traditional concept of the qualification of all military officers to serve as counsel before courts-martial.

(1) Had the board of review seen fit to decline a decision of the constitutional question, after having stated it and given its views thereon, there would have been respectable authority to sustain such action. Tobin v United States, 306 F2d 270 (CA DC Cir) (1962); International Mercantile Marine Co. v Stranahan, 155 Fed 428 (SD NY) (1907); Spreckels Sugar Refining Co. v McClain, 113 Fed 244 (CA 3d Cir) (1902).

Indeed, the Supreme Court, which is the ultimate authority on the construction of the Constitution, is reluctant to decide constitutional questions. It stated in United States v Rumely, 345 US 41, 48, 97 L ed 770, 73 S Ct 543 (1953):

"Grave constitutional questions are matters properly to be decided by this Court but only when they inescapably come before us for adjudication. Until then it is our duty to abstain from marking the boundaries of congressional power or delimiting the protection guaranteed by the First Amendment. Only by such self-restraint will we avoid the mischief which has followed occasional departures from the principles which we profess."

The decision made by the board of review on the constitutional question was such that the same could be reviewed by this Court only by certification by The Judge Advocate General of the Navy under Article 67(b)(2), supra. That decision also had the effect of denying to all constitutional courts, including the Supreme Court, any opportunity to review the question.

Considering the confusion and disruption of long-standing principles and procedures resulting from the far-reaching decision made, the board of review would have been well advised had it declined to make that decision, leaving it for higher competent review authority. In addition, there are numerous boards of review in the various services which could, most likely, reach different conclusions on far-reaching questions, thereby creating confusion worse confounded.

(2) It does, however, appear to be

**201**

essential that this Court determine this constitutional question. ▮▮▮▮▮▮ When a case has been decided by this Court, appellate review has terminated and the decision is "final and conclusive, . . . [and] binding upon all departments, courts, agencies, and officers of the United States," subject only to a petition for new trial, action of the Secretary, and authority of the President. Article 76, Uniform Code of Military Justice, 10 USC § 876; Shaw v United States, 209 F2d 811 (CA DC Cir) (1954). As Mr. Chief Justice Warren has said, Congress established this Court "as a sort of civilian 'Supreme Court' of the military."[1] Recognizing the limited area of review available to the Supreme Court in court-martial cases, we should not be unmindful of the fact that our decisions may restrict review by the Supreme Court.

(3) It would be fallacious to assume that a service member appears before a court-martial in the identical position as a defendant before a civilian court. From Powell v Alabama, 287 US 45, 77 L ed 158, 53 S Ct 55, 65 (1932), down to, and including, Gideon v Wainwright, 372 US 335, 9 L ed 2d 799, 83 S Ct 792 (1963), there persists the plight of one charged with crime before civilian courts, who appears alone and without counsel because he is indigent. Contrariwise, no service man appears before a court-martial alone and there are no ."indigents" before courts-martial. Inevitably, by law, the accused before a court-martial appears with appointed counsel and no funds are required. In this connection it should be remembered that when the Uniform Code of Military Justice was adopted, it represented a completely new concept of military justice. It was an effective break with the past. It incorporates the new and advanced view of inherent fairness and active concern for the rights and the welfare of those charged with crime. It reflects the advances charted until that time by the Supreme Court. It is diligent to assure due process of law for the accused.

The Uniform Code of Military Justice shows particular concern for the provision of counsel for all accused. At a special court-martial, as well as a general court-martial, the authority convening the court shall appoint defense counsel and, as appropriate, assistants. If the trial counsel before a special court-martial is qualified to act as counsel before a general court-martial, the defense counsel appointed shall be similarly qualified. If trial counsel is a judge advocate, law specialist, or a member of the bar of a Federal court or the highest court of a State, the defense counsel appointed shall likewise be one of the foregoing. Article 27(c), Uniform Code of Military Justice, supra.

Before a general court-martial the trial counsel and defense counsel shall be a judge advocate of the Army or the Air Force, or a law specialist of the Navy or Coast Guard, who is a graduate of an accredited law school or is a member of the bar of a Federal court or of the highest court of a State, and shall be certified as competent to perform such duties by The Judge Advocate General of the armed force of which he is a member. Article 27(b), Uniform Code of Military Justice, supra.

In addition, no charge shall be referred to a general court-martial until a thorough and impartial investigation is held at which the accused is advised of his right to be represented by counsel. He may be represented by civilian counsel if provided by him, or military counsel of his own selection if such counsel be reasonably available, or by counsel appointed by the officer exercising general court-martial jurisdiction over the command. Article 32, Uniform Code of Military Justice, 10 USC § 832.

Article 38(b) of the Uniform Code of Military Justice, 10 USC § 838, provides:

"The accused has the right to be

---

[1] "The Bill of Rights and the Military," James Madison Lectures, New York University Law Center, February 1, 1962, 37 New York University Law Review 181, 188.

represented in his defense before a general or special court-martial by civilian counsel if provided by him, or by military counsel of his own selection if reasonably available, or by the defense counsel detailed under section 827 of this title (article 27)."

From its beginning, this Court has examined the records of cases coming before it including, in addition to the record of trial, all proceedings had in the case prior to trial and throughout appellate review. These areas include the appointment of the court; preliminary hearing under Article 32, Uniform Code of Military Justice, supra; pretrial advice of the staff judge advocate to the convening authority and other preliminary actions; and posttrial review at its various stages. We have never hesitated to reverse convictions, even though the error be not assigned before us, for any prejudicial action appearing therein, including: Pleas of guilty when improvidently entered (United States v Henn, 13 USCMA 124, 32 CMR 124); right to qualified counsel during the Article 32 pretrial investigation (United States v Tomaszewski, 8 USCMA 266, 24 CMR 76; United States v Mickel, 9 USCMA 324, 26 CMR 104); adequacy of counsel (United States v Kraskouskas, 9 USCMA 607, 26 CMR 387); adequacy of representation by counsel (United States v Parker, 6 USCMA 75, 19 CMR 201; United States v McFarlane, 8 USCMA 96, 23 CMR 320; United States v Rosenblatt, 13 USCMA 28, 32 CMR 28); reasonable availability of individual military counsel requested by accused (United States v Tellier, 13 USCMA 323, 32 CMR 323); fair opportunity to be represented by civilian counsel (United States v Potter, 14 USCMA 118, 33 CMR 330).

It is also to be noted that, other than civilian counsel, all such services are rendered to the accused without any expense to him, including, in those instances where a punitive discharge is assessed, a personal copy of a verbatim transcipt of the record. Articles 18, 19 and 54, Uniform Code of Military Justice, 10 USC §§ 818, 819 and 854; paragraphs 82 and 83, Manual for Courts-Martial, United States, 1951. It is abundantly clear that defendants before military tribunals are, by law, provided with and shielded by a mantle of valuable protection extending to areas but recently the subject of discussion by the Supreme Court. Cf. Lane v Brown, 372 US 477, 9 L ed 2d 892, 83 S Ct 768 (1963); Draper v Washington, 372 US 487, 9 L ed 2d 899, 83 S Ct 774 (1963); Douglas v California, 372 US 353, 9 L ed 2d 811, 83 S Ct 814 (1963).

It might be noted that currently no member of the armed forces, other than in the naval service, may be subjected to a punitive discharge by a court-martial unless he is represented by counsel qualified under Article 27(b), Uniform Code of Military Justice, 10 USC § 827. This is effectively accomplished in the Army, as a practical matter, by not preparing a verbatim copy of the record in special court cases, thus precluding imposition of a bad-conduct discharge by such Army courts. See Army Regulations 22–145. The Air Force asserts that in 99% of its special court-martial cases, it provides counsel possessing the qualifications set forth in Article 27(b), Uniform Code of Military Justice, supra. However, this does not detract from the importance of the question, as the naval service is of the view that appointment of counsel qualified in accordance with Article 27(b) is impracticable, if not impossible, in its special courts-martial, because of the distribution of its personnel worldwide, many in small ships upon which no qualified counsel are available. More important, greatly dispersed combat operations might make qualified counsel unavailable in all of the services.

(4) From the earliest days of our military establishment, all officers of the military have been recognized as qualified to serve as counsel before courts-martial. Ability to discharge duties on courts-martial, consonant with his rank, has always been considered as one of the qualifications of a military officer. Included in the curriculum of the service academies is a course in military law. Other officers, by seminars and otherwise, have been

**203**

indoctrinated in military law upon entering the service. Further, Article 137, Uniform Code of Military Justice, 10 USC § 937, provides as follows:

"Sections 802, 803, 807–815, 825, 827, 831, 837, 838, 855, 877–934, and 937–939 (articles 2, 3, 7–15, 25, 27, 31, 37, 38, 55, 77–134 and 137–139) of this chapter shall be carefully explained to each enlisted member at the time of his entrance on active duty, or within six days thereafter. They shall be explained again after he has completed six months of active duty, and again at the time when he reenlists. A complete text of the Uniform Code of Military Justice and of the regulations prescribed by the President thereunder shall be made available to any person on active duty, upon his request, for his personal examination."

It is to be noted that the above-quoted Article requires the explanation of a major portion of the Uniform Code of Military Justice within six days after entrance into the service, six months thereafter, and upon reenlistment. It is of significance that included in the articles of the Code to be explained are Article 27 and Article 38, which provide the qualifications of counsel at courts-martial and the right to civilian counsel, individual military counsel, if available, or appointed defense counsel. It is certainly worthy of note that until the adoption of the Uniform Code of Military Justice in 1950, there was no statutory requirement that The Judge Advocate General of any of the military services be a member of the bar of a Federal court or the highest court of a State or Territory. See Section 13, Act of May 5, 1950, 81st Congress, 2d Session, 64 Stat 147.

I shall now proceed to the consideration of the questions certified to us.

That the military establishment was placed under the close supervision of the Congress is made clear by the context of the Constitution. The history of England and the colonies reflect deep-seated fear of standing armies, especially in time of peace. Authority for the existence of the army in England was subject to annual renewal by Parliament, as was the Mutiny Act. On the other hand, the necessity for national defense was a primary consideration. Thus we find the preamble stating one of the principal objects of the Constitution to be to "provide for the common Defence."

Article I, Section 8, makes certain that Congress, not the Executive, shall have power, "To declare War"; "To raise and support Armies";[2] "To provide and maintain a Navy"; "To make Rules for the Government and Regulation of the land and naval Forces"; "To provide for calling forth the Militia"; "To provide for organizing, arming, and disciplining, the Militia." See United States v Smith, 13 USCMA 105, 32 CMR 105.

It is historically true that the provisions for a standing army and Federal power over the militia gave rise to some of the strongest opposition to the ratification of the Constitution; and, no doubt, had great influence on the inclusion in the Bill of Rights of the Second and Third Amendments, guaranteeing the right to keep and bear arms and prohibiting the quartering of soldiers on the people in time of peace.

Without deciding the controversy as to the correct interpretation of the first clause of Section 8, Article I, it is to be noted the subject was deemed of sufficient importance to include among the powers committed to the Congress, to "provide for the common Defence."

The decisions of the Supreme Court have consistently recognized an overriding power in the Congress on the subject of military justice. In Burns v Wilson, 346 US 137, 140, 97 L ed 1508, 73 S Ct 1045 (1953), Mr. Chief Justice Vinson stated:

"Military law, like state law, is a jurisprudence which exists separate and apart from the law which

---

[2] It is noted, however, that a limited counterpart of the annual renewal of the Army is achieved by the clause, "but no Appropriation of Money to that Use shall be for a longer Term than two Years." ·

governs in our federal judicial establishment. This Court has played no role in its development; we have exerted no supervisory power over the courts which enforce it; the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers expressly entrusted that task to Congress."

At a much earlier time, the Supreme Court stated in Dynes v Hoover, 20 Howard 65, 79 (US 1858):

"These provisions show that Congress has the power to provide for the trial and punishment of military and naval offenses in the manner then and now practiced by civilized nations; and that the power to do so is given without any connection between it and the 3d article of the Constitution defining the judicial power of the United States; indeed that the two powers are entirely independent of each other."

See Runkle v United States, 122 US 543, 30 L ed 1167, 7 S Ct 1141 (1887); Ex parte Reed, 100 US 13, 25 L ed 538 (1879); Hiatt v Brown, 339 US 103, 94 L ed 691, 70 S Ct 495 (1950).

In Kinsella v United States, 361 US 234, 247, 4 L ed 2d 268, 80 S Ct 297 (1960), Mr. Justice Clark stated:

". . . There can be no question but that Clause 14 grants the Congress power to adopt the Uniform Code of Military Justice."

It is to be observed, however, that a system of military jurisprudence was not instituted by the Code. From the beginning of the Republic such system existed in the United States. It had existed under the Articles of Confederation and the Continental Congress adopted Articles of War. Indeed, a system of military jurisprudence existed in England long before the Revolution. I shall speak in more detail of these matters in a later part.

In the dissenting opinion of Mr. Justice Douglas, with whom Mr. Justice Black concurred, in Burns v Wilson, supra, I note the following:

"Of course the military tribunals are not governed by the procedure for trials prescribed in the Fifth and Sixth Amendments. That is the meaning of Ex parte Quirin, 317 US 1, 87 L ed 3, 63 S Ct 2, holding that indictment by grand jury and trial by jury are not constitutional requirements for trials before military commissions. Nor do the courts sit in review of the weight of the evidence before the military tribunal. Whelchel v McDonald, supra (340 US p 124). But never have we held that all the rights covered by the Fifth and Sixth Amendments were abrogated by Art I, § 8, cl 14 of the Constitution, empowering Congress to make rules for the armed forces. I think it plain from the text of the Fifth Amendment that that position is untenable." [346 US at page 152.]

It may not be necessary to note that neither has the Supreme Court held that all of the rights covered by the Fifth and Sixth Amendments apply to those in the military. Unless I misconstrue the series of opinions in the Supreme Court making the various provisions of the Bill of Rights "obligatory upon the States by reason of the Fourteenth Amendment," that Court has not held that all of the provisions of the Bill of Rights are thus obligatory on the States. Rather, the Supreme Court has considered each provision as it has been presented in each case before it.

While it is true that in United States v Sutton, 3 USCMA 220, 11 CMR 220, two judges of this Court, with the Chief Judge dissenting, gave strong implication that right "to be confronted with the witnesses against him" did not apply to an accused before a court-martial, that case was specifically overruled in United States v Jacoby, 11 USCMA 428, 29 CMR 244.

It should here be observed that in both *Sutton* and *Jacoby*, supra, only the right of confrontation was involved. In his Commentaries on the Constitution (1833), Justice Joseph Story

pointed out that the protections of the Sixth Amendment, except the right of compulsory process and the right to have the assistance of counsel, "does but follow out the established course of the common law in all trials for crimes." He then questions the necessity or advisability of including those established rights in the constitutional provision, unless the whole system is incorporated. 2 Story, Commentaries on the Constitution (Bigelow ed), section 1791, page 571. In section 1792, Justice Story points out, "The remaining clauses [of the Sixth Amendment] are of more direct significance and necessity." The distinction thus noted between the right to counsel and the other provisions of the Sixth Amendment, I believe, become material in our consideration of the question now before us. See 2 Story, supra, sections 1792, 1793 and 1794.

I agree, thoroughly and completely, with the view that members of the military are not shorn of their constitutional rights while they remain in the military service. Blackstone said:

"... he puts not off the citizen when he enters the camp; but it is because he is a citizen, and would wish to continue so, that he makes himself for a while a soldier." [1 Blackstone, Commentaries (Wendell ed), page 408.]

This Court has, in many cases, recognized the protection of military men by the Bill of Rights. We have also adverted to the statutory protection of those rights as contained in the Uniform Code of Military Justice. As examples: We have held that an accused shall not be denied "fundamental fairness, shocking to the universal sense of justice"; this we have denominated "military due process," connoting observance of his rights in his state, or status, of a soldier. See United States v Clay, 1 USCMA 74, 1 CMR 74. He is protected against unreasonable searches and seizures. United States v Vierra, 14 USCMA 48, 33 CMR 260; United States v Brown, 10 USCMA 482, 28 CMR 48. He cannot be compelled to be a witness against himself and that provision of the Fifth Amendment is preserved and expanded. United States v Kemp, 13 USCMA 89, 32 CMR 89; United States v Walker, 9 USCMA 187, 25 CMR 449. There are other cases and other instances. In short, we have proceeded, as has the Supreme Court, to examine each claim of deprivation of right as it has been presented to us. We should do likewise in this case.

We should seek the correct interpretation of the right "to have the Assistance of Counsel for his defence" as the same applies before courts-martial and, specifically, special courts-martial. At the threshold we are met by several recognized principles of constitutional interpretation, all of which, I believe, are applicable to our problem in some degree. Included are the interpretation of the provision from its own context; the interpretation of it in the light of the common law extant at the time of its adoption; contemporaneous interpretation by the Congress; the manner in which the right has been observed from the first Congress until the present day; and other recognized aids to interpretation.

I am not aware of any serious contention, now or in the past, that all of the provisions of the Sixth Amendment apply to courts-martial. I know of no contention, or decision, that trial by court-martial shall be in "the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law," as is clearly required by the Amendment; and clearly implied by Article III, Section 2, Clause 3.

When construed within the context of the Amendment, trial by jury would seem to be required in all criminal prosecutions. In Article III, Section 2, Clause 3, it is provided, "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury." Still the first Congress reenacted the Articles of War previously enacted by the Continental Congress on September 20, 1776, which provided no jury in courts-martial. Again, on April 10, 1806, after the adoption of the Bill of Rights, Congress enacted "rules and articles by which the armies of the United States

206

shall be governed," and included no provision for trial by jury.

The Supreme Court has held, consistently, that one whose status subjects him to trial by court-martial is not entitled to trial by jury. However, it has, on occasion, expressed that decision in different language. In Ex parte Milligan, 4 Wall 2, 123 (US 1866), the following appears:

". . . the framers of the Constitution, doubtless, meant to limit the right to trial by jury, in the Sixth Amendment, to those persons who were subject to indictment or presentment in the Fifth."

In Ex parte Quirin, 317 US 1, 87 L ed 3, 63 S Ct 2 (1942), the Supreme Court adverted to the rule of exception contained in *Milligan,* supra, but also included some very pertinent observations. It is true that both *Milligan* and *Quirin,* supra, were trials by military commission. However, the trial by jury provision is identical in the case of courts-martial, in this connection. We quote the following from Mr. Chief Justice Stone in *Quirin,* supra, at some length, because of the bearing it has on previously mentioned principles of constitutional interpretation.

"Presentment by a grand jury and trial by a jury of the vicinage where the crime was committed were at the time of the adoption of the Constitution familiar parts of the machinery for criminal trials in the civil courts. But they were procedures unknown to military tribunals, which are not courts in the sense of the Judiciary Article, Ex parte Vallandigham, 1 Wall (US) 243, 17 L ed 589; Re Vidal, 179 US 126, 45 L ed 118, 21 S Ct 48; cf. Williams v United States, 289 US 553, 77 L ed 1372, 53 S Ct 751, and which in the natural course of events are usually called upon to function under conditions precluding resort to such procedures. As this Court has often recognized, it was not the purpose or effect of § 2 of Article 3, read in the light of the common law, to enlarge the then existing right to a jury trial. The object was to preserve unimpaired trial by jury in all those cases in which it had been recognized by the common law and in all cases of a like nature as they might arise in the future, District of Columbia v Colts, 282 US 63, 75 L ed 177, 51 S Ct 52, but not to bring within the sweep of the guaranty those cases in which it was then well understood that a jury trial could not be demanded as of right.

"The Fifth and Sixth Amendments, while guaranteeing the continuance of certain incidents of trial by jury which Article 3, § 2 had left unmentioned, did not enlarge the right to jury trial as it had been established by that Article. Callan v Wilson, 127 US 540, 549, 32 L ed 223, 226, 8 S Ct 1301. Hence petty offenses triable at common law without a jury may be tried without a jury in the federal courts, notwithstanding Article 3, § 2, and the Fifth and Sixth Amendments. Schick v United States, 195 US 65, 49 L ed 99, 24 S Ct 826, 1 Ann Cas 585; District of Columbia v Clawans, 300 US 617, 81 L ed 843, 57 S Ct 660. Trial by jury of criminal contempts may constitutionally be dispensed with in the federal courts in those cases in which they could be tried without a jury at common law. . . .

"All these are instances of offenses committed against the United States, for which a penalty is imposed, but they are not deemed to be within Article 3, § 2 or the provisions of the Fifth and Sixth Amendments relating to 'crimes' and 'criminal prosecutions.' In the light of this long-continued and consistent interpretation we must conclude that § 2 of Article 3 and the Fifth and Sixth Amendments cannot be taken to have extended the right to demand a jury to trials by military commission, or to have required that offenses against the law of war not triable by jury at common law be tried only in the civil courts.

* * * * *

"Section 2 of the Act of Congress of April 10, 1806, 2 Stat at L 359, 371, chap 20, derived from the Reso-

**207**

lution of the Continental Congress of August 21, 1776, imposed the death penalty on alien spies 'according to the law and usage of nations, by sentence of a general court martial.' This enactment must be regarded as a contemporary construction of both Article 3, § 2, and the Amendments as not foreclosing trial by military tribunals, without a jury, of offenses against the law of war committed by enemies not in or associated with our Armed Forces. It is a construction of the Constitution which has been followed since the founding of our government, and is now continued in the 82d Article of War. Such a construction is entitled to the greatest respect." [317 US at pages 39–42.]

The Act of 1806, above mentioned as being a contemporary construction of the Constitution, is the identical act, hereinafter mentioned, as reenacting the provision as to counsel. If this language is not dispositive of the question before us, it is certainly highly persuasive.

I include my own observation that considerable light on the question of lack of jury trial might be secured by reference to Blackstone:

"The people, whether aliens, denizens, or natural-born subjects, are divisible into two kinds, the clergy and the laity. . . ." [1 Blackstone, supra, page 376.]

He points out "benefit of clergy," and other privileges of and restrictions upon, the clergy, even though they be subjects.

At page 396 of the same volume, appears:

"The lay part of his majesty's subjects, or such of the people as are not comprehended under the denomination of clergy, may be divided into three distinct states, the civil, the military, and the maritime."

It is of more than passing interest that in Blackstone's time the military state, or status, and the maritime state did not enjoy the right of trial by jury. So, too, in the United States, at the present time court-martial jurisdiction

depends upon the "state" or status of the one brought to trial. Toth v Quarles, 350 US 11, 100 L ed 8, 76 S Ct 1 (1955); Reid v Covert, 354 US 1, 1 L ed 2d 1148, 77 S Ct 1222 (1957); Kinsella v United States, supra. In the Declaration, the colonists complained of the action of making them subject to "a jurisdiction foreign to our constitution and unacknowledged by our laws." George III had been willing to maintain maritime or admiralty courts in the colonies and refer trials to them, for there was no jury in the maritime court and a jury composed of colonists would not be present when colonists were brought to trial. It is clear that status determined rights and privileges.

In 1215, *Magna Carta* had declared:

". . . No freeman shall be taken, imprisoned, disseised, outlawed, banished, or in any way destroyed, nor will We proceed against or prosecute him except by lawful judgment of his peers or the law of the land." [Bloom, History of the Formation of the Union under the Constitution, page 515 (1941).]

Notwithstanding, in England there was no trial by jury in maritime or admiralty courts and, under restrictions as to where, when and by whom the military might be tried, in courts-martial. Even as today, in our own country, there is no jury in admiralty proceedings or courts-martial. The Seventh Amendment is limited to "Suits at common law," doubtless a contemporary acknowledgment that trial by jury did not exist in suits in equity or proceedings in admiralty and it should remain so.

It seems abundantly clear that the right to trial by jury in "[T]he trial of all crimes" and "[I]n all criminal prosecutions" has consistently been construed to be limited to those cases in which trial by jury was available at common law. I pose the question: Can there be a distinction between the right of an accused to jury trial and "the Assistance of Counsel for his defence"?[3] We should therefore proceed

---

[3] It may be noted, in this connection, that trial by jury is protected two

to determine the interpretation of "Assistance of Counsel" in the light of the common law.

As the Supreme Court stated in Powell v Alabama, 287 US 45, 60, 77 L ed 158, 53 S Ct 55 (1932):

"If recognition of the right of a defendant charged with a felony to have the aid of counsel depended upon the existence of a similar right at common law as it existed in England when our Constitution was adopted, there would be great difficulty in maintaining it as necessary to due process. Originally, in England, a person charged with treason or felony was denied the aid of counsel, except in respect of legal questions which the accused himself might suggest. At the same time parties in civil cases and persons accused of misdemeanors were entitled to the full assistance of counsel. After the revolution of 1688, the rule was abolished as to treason, but was otherwise steadily adhered to until 1836, when by act of Parliament the full right was granted in respect of felonies generally. 1 Cooley, Const. Lim., 8th ed 698, et seq, and notes."

By our standards that right was totally inadequate. In fact, so inadequate shortly before and at the Revolution, that it was severely condemned by Blackstone, and by Story, in section 1793 of his Commentaries, supra, at page 573. Counsel was denied in capital cases, except treason, and capital cases in that day and time extended to a long list of crimes which today would, in instances, be regarded as only misdemeanors. Moreover, the notion of counsel, when it existed—as in minor offenses—was far from our concept of active participation as an adversary who addressed the court, cross-examined witnesses, produced witnesses, and generally sought justice for the accused. Indeed, in the most serious cases he was denied witnesses in his defense, resulting in the provision of the Sixth Amendment, "to have compulsory process for obtaining witnesses in his favor." 2 Story, supra, section

1792, page 572. Actually counsel, when allowed in these cases, was little more than "a friend to sit by and advise the prisoner," or, as sometimes denominated, "Amicus curiae." His office was to suggest questions and procedures to the prisoner. He did not personally participate.

Nowhere do I find any suggestion that even this limited right extended to courts-martial. For, as observed in 1 Blackstone, supra, at page 412:

". . . for martial law, which is built upon no settled principles, but is entirely arbitrary in its decisions, is, as Sir Matthew Hale observes, in truth and reality no law, but something indulged rather than allowed as a law."

It is within this background that the Sixth Amendment must be interpreted. The framers of the Constitution deliberately preserved within our system much of the English Constitution and common law; other portions they changed. In other instances they sought to prevent violations of constitutional rights of which they had complained in the Declaration of Independence. United States v Smith, supra.

What they accomplished as to criminal trials in Federal civilian courts is made clear in Johnson v Zerbst, 304 US 458, 82 L ed 1461, 58 S Ct 1019 (1938). The extent to which the "Assistance of Counsel" provided by the Sixth Amendment is "obligatory on the States" by reason of the Fourteenth Amendment, as to felonies at least, is settled by Gideon v Wainwright, supra. See Powell v Alabama, supra. Cf. Betts v Brady, 316 US 455, 86 L ed 1595, 62 S Ct 1252 (1942). Reference to the cases here cited and the authorities therein collated will illuminate adequately the concept of assistance of counsel in the civilian courts and I shall now confine myself to that question in military jurisprudence.

We have seen that the apparently mandatory provision of the Sixth Amendment of trial by jury is, when correctly interpreted, restricted by the common law as it existed when the amendment was adopted, its contemporary interpretation, and in the light of

times by the Constitution and assistance of counsel only once.

the long-continued and consistent interpretation thereof. Does the same result follow as to assistance of counsel? I believe it does.

The law existing at the time of adoption would seem to be most forcefully illustrated by the British Articles of War of 1765, existing at the beginning of the Revolution, the Articles enacted by the Continental Congress, and the Articles enacted by the first Congress, before the adoption of the Bill of Rights.

These British Articles provided in Section XV, Article VI:

> "The Judge Advocate General, or some person deputed by him, shall prosecute in His Majesty's Name. . . ." [Text included in Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, at pages 931, 942.]

Those articles contain no reference to assistance of counsel for the accused, and no such right existed.

The Articles of War enacted by the Continental Congress on September 20, 1776, in Section XIV, Article 3, contained the following:

> "The judge-advocate general, or some person deputed by him, shall prosecute in the name of the United States of America. . . ." [Text included in Winthrop's Military Law and Precedents, supra, at page 967.]

Again, there is no provision for counsel for the accused.

A departure from the previous concept of no counsel at all for the accused before court-martial was altered, and some responsibility therefor placed upon the judge advocate in the Articles enacted by the Continental Congress on May 31, 1786. Article 6 thereof reads:

> "The judge advocate, or some person deputed by him, or by the general or officer commanding the army, detachment or garrison, shall prosecute in the name of the United States of America; *but shall so far consider himself as counsel for the prisoner, after the said prisoner shall have made his plea, as to object to any leading question, to any of the*

*witnesses, or any question to the prisoner, the answer to which might tend to criminate himself. . . ."* [Emphasis supplied.] [Text included in Winthrop's Military Law and Precedents, supra, at page 972.]

The foregoing is the only provision in those articles for counsel for the accused. Its inclusion there, for the first time, set the pattern of representation of both sides by the judge advocate which continued in American military jurisprudence for many years to come. Actually it is recognition that a judge advocate, as his name implies, had a dual capacity. He was a "judge" and he was an "advocate."

The emphasized language imported into trials by courts-martial the concept which existed in capital cases in England, that the judge protected the prisoner. That duty was placed on the judge advocate, apparently in his capacity as judge. This concept regarding capital cases was condemned in the strongest terms by both Blackstone and Story, but it persisted in England and in courts-martial in the United States. Story had this to say of it in his Commentaries, supra, section 1792, page 573:

> "Another anomaly in the common law is, that in capital cases the prisoner is not, upon his trial upon the general issue, entitled to have counsel, unless some matter of law shall arise proper to be debated. That is, in other words, that he shall not have the benefit of the talents and assistance of counsel in examining the witnesses or making his defence before the jury. Mr. Justice Blackstone, with all his habitual reverence for the institutions of English jurisprudence as they actually exist, speaks out upon this subject with the free spirit of a patriot and a jurist. This, he says, is 'a rule, which—however it may be palliated under cover of that noble declaration of the law, when rightly understood, that the judge shall be counsel for the prisoner, that is, shall see that the proceedings against him are legally and strictly regular— seems to be not all of a piece with

the rest of the humane treatment of prisoners by the English law. For upon what face of reason can that assistance be denied to save the life of a man, which is yet allowed him in prosecutions for every petty trespass?' "

At the first session of the First Congress the following was enacted:

"Sec. 4. *And be it further enacted,* That the said troops shall be governed by the rules and articles of war which have been established by the United States in Congress assembled, or by such rules and articles of war, as may hereafter by law be established." [Act of September 29, 1789, 1 Stat 96.]

That enactment provided it should continue and be in force until the end of the next session of Congress, and no longer. At the second session of the First Congress there was passed, "An Act for regulating the Military Establishment of the United States," section 13 of which provided:

". . . That . . . [soldiers] shall be governed by the rules and articles of war, which have been established by the United States in Congress assembled, as far as the same may be applicable to the constitution of the United States, or by such rules and articles as may hereafter by law be established." [Act of April 30, 1790, 1 Stat 121.]

It is to be noted that of the thirty-nine members of the Constitutional Convention who signed the Constitution, fifteen were members of the First Congress and George Washington, President of the Convention, was President of the United States. Included in that fifteen was James Madison, who continued as a member of the House through the Fourth Congress. It is congressional history that Madison, a member of the House from Virginia, was the author of the Bill of Rights and, on the floor, managed the resolution submitting the same to the States. 1 Stat 97.[4]

The required three-fourths of the

States had ratified the Bill of Rights on December 15, 1791, and on that date the President so advised the Congress.

In 1806 Congress enacted new "rules and articles by which the armies of the United States shall be governed." Act of April 10, 1806, Ninth Congress, 1st Session, 2 Stat 359. Article 69 of this act repeated verbatim Article 6 of the articles enacted by the Continental Congress in 1786, supra. Hence, the contemporary construction of the Constitution referred to by the Supreme Court in *Quirin,* supra, is evident, and thus the judge advocate was continued as the only counsel participating for the accused. With minor changes, all of the Articles of 1806 remained in effect until 1874, and were in effect throughout the Civil War.

In the revision of the Articles of War, enacted by Congress June 22, 1874, the language of Article 69 of the Act of 1806 is repeated, almost verbatim, in Article 90. See Winthrop's Military Law and Precedents, supra, page 993.

The Articles of War were again revised by the Act of August 29, 1916, and, to my knowledge, defense counsel as such was mentioned for the first time, Article of War 17, reading as follows:

". . . The judge advocate of a general or special court-martial shall prosecute in the name of the United States, and shall, under the direction of the Court, prepare the record of its proceedings. The accused shall have the right to be represented before the court by counsel of his own selection for his defense, if such counsel be reasonably available, but should he, for any reason, be unrepresented by counsel, the judge advocate shall from time to time throughout the proceedings advise the accused of his legal rights." [39 Stat 650, 653.]

I am not unaware of treatises and articles containing categorical statements to the effect that, even before this statute, "it was traditional to allow the accused legal assistance," "courts-martial always admit counsel for the

---

[4] See also, McNeil, Forge of Democracy, pages 27 and 313 (1963).

prisoner," and others of similar import. However, with due respect, I believe such statements to arise from misconstruction, are taken out of context from earlier writers, or referred to practices in vogue but not required. Again, in some of such works, other passages indicate the writer has used such terms in the limited sense of counsel being "amicus curiae," or the privilege of having a friend sit beside him and instruct him what questions to write out and hand to the judge advocate to be read to the court by that functionary. Some of these works are quite old and not readily accessible; however, I have given those available careful consideration. Among others, I have consulted: "A Treatise on Courts-Martial" by S. Payne Adye, Deputy Judge Advocate to his Majesty's Troops serving in North America, published in London in 1810; "Principles and Practice of Naval and Military Courts Martial" by John McArthur, formerly secretary to Admiral Lord Hood and officiating Judge Advocate at various courts-martial, 4th edition published in London in 1813, with the first edition having been published in June 1792; "Observations on Military Law, and the Constitution and Practice of Courts Martial, as Applicable to the Laws, Regulations and Customs, of the Army and Navy of the United States by William C. De Hart, Captain Second Regiment Artillery," published in New York in 1846. It is my considered opinion that such have no substantial bearing on the problem we are considering. See also, Henderson, "Courts Martial and the Constitution: The Original Understanding," 71 Harvard Law Review 293 (1957).

Winthrop, in his Military Law and Precedents, 2d ed, 1920 Reprint, adverting to these and other pronouncements on the subject of counsel at courts-martial, has given an authoritative and illuminating appraisal of the question. He notes, at page 165, that a General Order of 1890 required the detail at general courts-martial, upon the request of the accused, of a "suitable officer" as his counsel, "if practicable." Winthrop then states:

". . . But in general it is to be said that the admission of counsel for the accused in military cases, is not a right but a privilege only, but yet a privilege almost invariably acceded and as a matter of course; and this whether the counsel proposed to be introduced be a military or civil, professional or unprofessional person.

"But being a privilege, it is subject to be restricted by the court."

At pages 166–67 of his Treatise, Winthrop discusses the status of counsel and the rule as to his limited participation in the trial. He then develops the evolution of the practice of permitting wider participation of counsel in the trial, concluding:

". . . Thus, in practice, the old rule is mainly held in reserve, to be enforced by the court at its discretion in exceptional cases. Objection to the reading of the final address, or to a closing oral or written argument by the counsel, is now of the rarest occurrence."

The first statutory provision in the United States providing for the appointment of defense counsel was contained in the revision of the Articles of War in 1920, by the Act of June 4 of that year. Article of War 11 of that act provided:

"For each general or special court-martial the authority appointing the court shall appoint a trial judge advocate and a defense counsel. . . ." [41 Stat 787, 789.]

Article of War 17 thereof reads as follows:

"The trial judge advocate of a general or special court-martial shall prosecute in the name of the United States, and shall, under the direction of the court, prepare the record of its proceedings. The accused shall have the right to be represented in his defense before the court by counsel of his own selection, civil counsel if he so provides, or military if such counsel be reasonably available, otherwise by the defense counsel duly appointed for the court pursuant to article 11." [41 Stat 787, 790.]

Notwithstanding this significant ad-

212

vance in the protection of the legal rights of an accused before courts-martial, it is to be noted that there was no attempt to provide members of the Judge Advocate Corps or persons qualified in the law as members of the court, trial judge advocate, or defense counsel. Article 8 of the Articles of War of 1920 did provide that a member of the Judge Advocate General's Department be detailed as law member, "except that when an officer of that department is not available for the purpose the appointing authority shall detail instead an officer of some other branch of the service." With regard to this requirement, as recently as 1950, in Hiatt v Brown, supra, the Supreme Court held a court-martial to be legally convened to which only one member of the Judge Advocate General's Department was appointed, he as assistant trial judge advocate who was absent from the trial on verbal orders of the commanding general. See also Whelchel v McDonald, 340 US 122, 95 L ed 141, 71 S Ct 146 (1950).

After the termination of World War II the Congress undertook a complete revision of the system of military justice of the Army.[5] The Committee on Armed Services entrusted that overwhelming task to its Legal Subcommittee on which Honorable Charles H. Elston of Ohio was chairman.[6] The subcommittee became popularly known as "The Elston Committee" and the legislation it produced the "Elston Act."

The Elston Act, Public Law 759, 80th Congress, 62 Stat 627, approved June 24, 1948, by its terms became effective on the first day of the eighth calendar month after its approval. While that Act was based upon, and constituted an amendment to, the previously existing Articles of War, in many respects it represented a radical departure from former provisions of both substantive law and procedure.

Article 11 of the Elston Act re-enacted, verbatim, the provisions of Article 11 of the revision of 1920. However, it added most important provisos as follows:

". . . *Provided,* That the trial judge advocate and defense counsel of each general court-martial shall, if available, be members of the Judge Advocate General's Corps or officers who are members of the bar of a Federal court or of the highest court of a State of the United States: *Provided further,* That in all cases in which the officer appointed as trial judge advocate shall be a member of the Judge Advocate General's Corps, or an officer who is a member of the bar of a Federal court or of the highest court of a State, the officer appointed as defense counsel shall likewise be a member of the Judge Advocate General's Corps or an officer who is a member of the bar of a Federal court or of the highest court of a State of the United States. . . ."

Thus, for the first time officers qualified in the law, lawyers, were by statute required to be made available, on a limited basis, to the accused. It is undeniably true, confirmed by history, that lawyers for the accused before courts-martial were shunned by the military.[7] This act was a beginning.

---

[5] In the 80th Congress the jurisdiction of the former Committee on Military Affairs and the former Committee on Naval Affairs were consolidated in the Committee on Armed Services, in both the House of Representatives and the Senate. This was in accordance with the Legislative Reorganization Act of 1946.

[6] The author judge served as the ranking minority member of that subcommittee and, with Mr. Elston, submitted that legislation to the House of Representatives. See 94 Congressional Record 157, et seq., 80th Congress, 2d Session, January 14, 1948.

[7] See, among others, treatises mentioned hereinbefore. We commend to the interested reader an article entitled, "Courts-Martial and the Bill of Rights: The Original Practice I," 72 Harvard Law Review 1 (1958), by Frederick Bernays Wiener, Esquire. In this article Mr. Wiener includes much material resulting from original research in the records of the military services and the National Archives. His documentation will illustrate the

In a very short time it was to be greatly strengthened.

During the 81st Congress, the National Security Act of 1947, Public Law 253, 80th Congress, approved July 26, 1947,[8] having become effective, the Committee on Armed Services of the House, again undertook a revision of the system of military justice of the armed forces.[9] That committee reported and the Congress passed the Act of May 5, 1950, 64 Stat 107, the enacting clause of which read:

". . . That a Uniform Code of Military Justice for the government of the armed forces of the United States, unifying, consolidating, revising, and codifying the Articles of War, the Articles for the Government of the Navy, and the disciplinary laws of the Coast Guard, is hereby enacted as follows, and the articles in this section may be cited as 'Uniform Code of Military Justice, Article ——'."

The provisions for counsel before courts-martial are contained in Articles 27 and 38(b). Article 27 of the Uniform Code, supra, reads:

"(a) For each general and special court-martial the authority convening the court shall detail trial counsel and defense counsel, and such assistants as he considers appropriate. No person who has acted as investigating officer, law officer, or court member in any case may act later as trial counsel, assistant trial counsel, or, unless expressly requested by the accused, as defense counsel or assistant defense counsel in the same case. No person who has acted for the prosecution may act later in the same case for the defense, nor may any person who has acted for the defense act later in the same case for the prosecution.

"(b) Trial counsel or defense counsel detailed for a general court-martial—

(1) must be a judge advocate of the Army or the Air Force, or a law specialist of the Navy or Coast Guard, who is a graduate of an accredited law school or is a member of the bar of a Federal court or of the highest court of a State; or must be a member of the bar of a Federal court or of the highest court of a State; and

(2) must be certified as competent to perform such duties by the Judge Advocate General of the armed force of which he is a member.

"(c) In the case of a special court-martial—

(1) if the trial counsel is qualified to act as counsel before a general court-martial, the defense counsel detailed by the convening authority must be a person similarly qualified; and

(2) if the trial counsel is a judge advocate, or a law specialist, or a member of the bar of a Federal court or the highest court of a State, the defense counsel detailed by the convening authority must be one of the foregoing."

It was contended in argument before us that the foregoing Article did not authorize officers not qualified under its terms to serve as defense counsel before special courts-martial and that such a conclusion must be by inference only. Even if the qualification of officers not specifically mentioned were by inference, that inference is plain. But, more important, Article 27 is not to be read *in vacuo*, but in the light of the law existing at the time of its enactment. Clearly, at that time all military

---

status and limited prerogatives of "counsel for the accused" from early to comparatively recent times. See also, Part II of the same article in 72 Harvard Law Review 266 (1958).

[8] This was the so-called "Unification Act."

[9] The author judge was not a member of the subcommittee which prepared the Uniform Code of Military Justice. He was, however, a ranking majority member of the Committee on Armed Services which considered the report of the subcommittee in detail. See Hearings before House Armed Services Committee, 81st Congress, 1st Session, on H. R. 4080, page 1326 et seq.

officers were so qualified and Article 27 changed the existing law only to the extent provided by its terms. Therefore military officers continue qualified as counsel as previously, except as changed by Article 27, supra. Romero v Squier, 133 F2d 528 (CA 9th Cir) (1943). See also Altmayer v Sanford, 148 F2d 161 (CA5th Cir) (1945); Hayes v Hunter, 83 F Supp 940 (Kan) (1948); Duval v Humphrey, 83 F Supp 457 (MD Pa) (1949); Adams v Hiatt, 79 F Supp 433 (MD Pa) (1948); United States v Long, 5 USCMA 572, 18 CMR 196; United States v Davis, 1 USCMA 102, 2 CMR 8.

Article 38(b), Uniform Code of Military Justice, supra, reads as follows:

"The accused has the right to be represented in his defense before a general or special court-martial by civilian counsel if provided by him, or by military counsel of his own selection if reasonably available, or by the defense counsel detailed under section 827 of this title (article 27). Should the accused have counsel of his own selection, the defense counsel, and assistant defense counsel, if any, who were detailed, shall, if the accused so desires, act as his associate counsel; otherwise they shall be excused by the president of the court."

The Uniform Code of Military Justice follows the format of the Articles of War rather than the Articles for the Government of the Navy. I have, therefore, traced the development of counsel for the accused in that context. I have examined the Articles for the Government of the Navy and nothing is contained therein, on this subject, to alter or mitigate any of my discussions herein.

Even the casual reader must be deeply impressed with advances made in the administration of military justice. Through the ages and from the days of so-called "drum head" justice "trial by court-martial" has been the dread of free men. It is a consolation to all to know the vigorous steps which have been taken to surround court-martial trials with the inherent fair play, basic and substantial justice which prevails under the Anglo-American system of justice, and at the same time provide expeditious disposition of military trials. As stated in Ex parte Milligan, supra:

"The discipline necessary to the efficiency of the army and navy, required other and swifter modes of trial than are furnished by the common law courts; and, in pursuance of the power conferred by the Constitution, Congress has declared the kinds of trial and the manner in which they shall be conducted, for offenses committed while the party is in the military or naval service. Every one connected with these branches of public service is amenable to the jurisdiction which Congress has created for their government, and, while thus serving, surrenders his right to be tried by the civil courts." [4 Wall at page 123.]

My analysis of the law affecting counsel for the accused before courts-martial, leads me to the identical conclusion reached by the Supreme Court as to trial by jury in the case of Ex parte Quirin, supra, that is:

First. When read in the light of the common law, the purpose of the Sixth Amendment was not to enlarge the right to counsel before courts-martial, but to provide it in those instances in which it was denied in civilian courts at that time.

Second. The reenactment by the First Congress on two occasions of the previously existing Articles adopted by the Continental Congress, and the action of Congress in 1806 in reenacting the identical provision as to counsel, must be regarded as contemporary construction of the constitutional provisions. It is a construction which has been followed since the founding of our government. Such construction is entitled to the greatest respect.

Third. In the light of the long-continued and consistent interpretation of the Sixth Amendment it cannot be taken to have extended the right to counsel, which did not ex-

ist at common law before courts-martial.

Considered in light of the foregoing and in light of Article I, Section 8, Clause 14, I find nothing in Article 27, Uniform Code of Military Justice, supra, when supplemented by Article 38(b) thereof, which conflicts with the Sixth Amendment; rather such provisions are compatible therewith.

In addition, the Congress having the undisputed right to enact the Uniform Code of Military Justice and to establish courts-martial and fix the qualifications of members thereof, it certainly has the power to prescribe the qualifications of counsel who appear before such courts. Nor is there anything to prevent the Congress from providing one qualification for counsel before general courts and another qualification for counsel before special courts.

A large percentage of cases heard by special courts-martial are by no means petty violations. However, the maximum sentence permitted is greatly diminished from that permitted by general courts-martial. Just as a distinction may be made as to trial by jury between serious and petty offenses, so too a distinction as to qualifications of counsel before general and special courts-martial is permissible. District of Columbia v Colts, 282 US 63, 75 L ed 177, 51 S Ct 52 (1930); Schick v United States, supra; District of Columbia v Clawans, supra; Ex parte Quirin, supra.

I would, therefore, hold that the board of review was in error in holding that the accused, as a matter of right, under the Sixth Amendment, ment, was entitled to counsel; I would also hold that the defense counsel appointed for him met with the requirements of Article 27 and 38(b), Uniform Code of Military Justice, supra.

The question of the adequacy or competency of counsel appointed is not before us. Neither are we presently concerned as to whether Congress might eliminate counsel before courts-martial, general or special. As previously noted herein, qualifications of counsel for courts-martial are a matter within the sound discretion of Congress. That Body, in balancing military requirements in time of hostilities as well as in time of peace, is authorized to make such desirable changes as it may see fit. And, while, in my opinion, counsel is not required by the Sixth Amendment, that Body has cloaked accused with substantial and desirable protections in that area, and may extend the same.[10] In the unlikely event Congress were to diminish those protections, it would be necessary to determine whether an accused was denied military due process.

My brothers having concurred in the result reached by me, the record will be returned to The Judge Advocate General of the Navy for further action not inconsistent with this opinion.

QUINN, Chief Judge (concurring in the result):

It has long been my position that service personnel "are entitled to the rights and privileges secured to all under the Constitution of the United States, unless excluded directly or by necessary implication, by the provi-

---

[10] Indeed, it may be noted that legislation, which I regard as highly desirable, to enlarge these protections has recently been introduced in the Congress. See S. 2003, 88th Congress, 1st Session, which would amend the last sentence of Article 19, Uniform Code of Military Justice, 10 USC § 819, dealing with the jurisdiction of special courts-martial, to read:

"A bad-conduct discharge may not be adjudged unless a complete record of the proceedings and testimony before the court has been made *and, except in time of war, unless the accused was represented at the trial, or afforded the opportunity to be represented at the trial, by a defense counsel with qualifications not less than those prescribed under section 827(b) of this title (article 27(b))."* [Portion added by the proposed amendment italicized.]

216

sions of the Constitution itself." United States v Sutton, 3 USCMA 220, 228, 11 CMR 220, dissenting opinion; United States v Voorhees, 4 USCMA 509, 16 CMR 83. Hence, I disagree with the conclusion that the Sixth Amendment's guarantee of the right to counsel is not applicable to trials by courts-martial. However, Article 38(b) of the Uniform Code of Military Justice, 10 USC § 838, specifically refers to an accused's "right" to counsel before a general or special court-martial, and Article 27 (b) and (c) of the Code, 10 USC § 827, establish the qualifications of the individuals who may be appointed as counsel. Thus, the source of a serviceman's right to counsel provides only a starting point for an answer to the problem presented by the first question certified by The Judge Advocate General. The critical inquiry is: Does Article 27(c) of the Code satisfy the requirements of the Sixth Amendment?

In my opinion it does. This leads me to the same conclusion as that reached by Judge Kilday. Hence, further elaboration of the reasons which lead me to my starting point is unnecessary for the purposes of this case. A brief outline of the route I follow will suffice.

Article 27(c) requires that in special courts-martial the defense counsel shall be specially qualified in the law only if the trial counsel is. Otherwise, any officer may be appointed to fill that role. This does not mean that counsel before special courts are or may properly be unqualified. On the contrary, as Judge Kilday points out, a knowledge of the Uniform Code is required of every officer, and, of necessity, each is conversant with required military behavior, violations of which give rise to the vast majority of cases tried before special courts-martial. One who is designated a defense counsel must be familiar with all pertinent parts of the Manual for Courts-Martial wherein the procedural regulations for practice before military tribunals are promulgated. With a full knowledge of the Uniform Code and of the procedural regulations applicable to trial by special court-martial, an officer designated as defense counsel is generally competent to determine whether the charge is good

or bad, whether the evidence available to the prosecution is admissible, and whether a defense exists and how to present it. See Gideon v Wainwright, 372 US 335, 9 L ed 2d 799, 83 S Ct 792 (1963) ; Powell v Alabama, 287 US 45, 69, 77 L ed 158, 53 S Ct 55 (1932).

The board of review did not discuss the foregoing qualifications, but appears to have rejected them as constitutionally unsatisfactory. Its conclusion is that an accused is entitled, under the Sixth Amendment, to "one qualified in the law," and it appears to use the quoted phrase in the sense of a fully trained lawyer.

The difficulty with this conclusion is that it fails to take into consideration the holdings of the Supreme Court of the United States, relied on by the principal opinion as support for the conclusion therein stated, and in which I concur, that "the Congress having the undisputed right to enact the Uniform Code of Military Justice and to establish courts-martial and fix the qualifications of members thereof, it certainly has the power to prescribe the qualifications of counsel who appear before such courts."

The first question certified requires a determination whether the qualifications established for nonlawyers who represent those who stand accused before a special court-martial—a tribunal over which Congress has "exclusive jurisdiction"—bear a reasonable relationship to the purpose to be accomplished. See Ex parte Garland, 4 Wall 333, 379 (U. S. 1866) ; Sperry v Florida, 373 US 379, 10 L ed 2d 428, 83 S Ct 1322 (1963).

The preliminary and trial procedures of a special court-martial, unlike those of a general court-martial, are different from the proceedings in the civilian courts. The offenses that come before the special court-martial are frequently military in nature. An officer's ordinary training and experience, therefore, are reasonably calculated to make him learned in the simplified procedures and in the substance of the military type offenses that normally come before such courts.

Although serious civilian type of-

**217**

fenses are also the subject of such trials, Congress did not predicate qualification of counsel upon the nature of the offense, but upon the nature of the court-martial; and it did not establish as a requisite of qualification, formal law school, or military "law office" study. Instead, it took other measures to insure that the prescribed qualifications were adequate to the end to be achieved; namely, effective assistance in defending against the charges and in safeguarding the accused's rights. Going far beyond the civilian practice, it provided for automatic appellate review of all special court-martial convictions. In those cases where the accused is sentenced to a bad-conduct discharge, it has provided for review of the law, the facts, and the sentence by a board of review. Thereafter, the accused is entitled to further review by this Court on issues of law affecting either the findings or the sentence. The record of the proceedings is scrutinized to make certain that qualification, in theory, is matched by performance. United States v Gardner, 9 USCMA 48, 25 CMR 310.

I do not suggest that comprehensive appellate review is a proper substitute for the right to the assistance of counsel at trial, as prescribed by the Sixth Amendment. See Douglas v California, 372 US 353, 9 L ed 2d 811, 83 S Ct 814 (1963). I do say, however, that the singular nature of special courts-martial is such that the existing qualifications for counsel before those courts are reasonably calculated to insure that appointed counsel possess knowledge of the law and procedure normally incident to special court-martial practice; and, considering the safeguards established by Congress to insure that presumptive skill is demonstrated by actual performance, there is, in my opinion, compliance with the mandate of the Sixth Amendment. On that basis, I agree with Judge Kilday's conclusion that the board of review erred in holding that appointed defense counsel in a special court-martial must be "qualified in the law," in the sense that he must be a fully trained lawyer.

Although this disposes of the constitutional question presented, it does not cover the question of the desirability of continuing to permit nonlawyers to practice before tribunals empowered to impose bad-conduct discharges. As to this phase of the case, I share the views so ably expressed by Judge Ferguson.

FERGUSON, Judge (concurring in the result):

With due respect for the scholarly approach of my brothers to the certified questions, I would normally decline to join them in reaching the constitutional issue presented to us by The Judge Advocate General. The questions on which our review is sought are purely hypothetical.

As indicated in the principal opinion, the board of review determined that accused's pleas of guilty were improvident and that multiple prejudicial error existed. Having found that reversal was thus necessitated, it nevertheless went on to hold that the Sixth Amendment to the United States Constitution required an accused tried by special court-martial to be furnished with an appointed military lawyer to defend him. It is the propriety of the latter *obiter dictum* which has been certified to this Court.

First, I consider the question before us to be moot, for, whether it be answered in the affirmative or in the negative, the action taken will have the effect of affirming the decision of the board of review. Under such circumstances, we have, in the past, uniformly refused to render purely advisory opinions to The Judge Advocates General. United States v Bedgood, 12 USCMA 16, 30 CMR 16; United States v Armbruster, 11 USCMA 596, 29 CMR 412; United States v Storey, 9 USCMA 162, 25 CMR 424; United States v Fisher, 7 USCMA 270, 22 CMR 60.

Second, the refusal to decide moot questions is peculiarly important when a constitutional question is involved. The Supreme Court has many times pointed out the duty of judges to refrain from adjudicating the constitutionality of a legislative enactment unless it was inescapably required. United States v Rumely, 345 US 41, 97 L ed 770, 73 S Ct 543 (1953);

218

United Public Workers v Mitchell, 330 US 75, 91 L ed 754, 67 S Ct 556 (1947); Youngstown Sheet and Tube Co. v Sawyer, 343 US 579, 96 L ed 1153, 72 S Ct 863 (1952). It is equally our responsibility to refrain from passing upon and measuring the conformity of Articles of the Uniform Code of Military Justice with the Constitution unless that course is imperative. Cf. United States v Jacoby, 11 USCMA 428, 29 CMR 244.

My brothers, however, have chosen to reach the question and have set down their varying approaches to the problem. As they have done so, I feel it incumbent upon me to record my own views in this area in order that the basic principle involved may be firmly settled.

I am satisfied that the Sixth Amendment, insofar as it pertains to the right of counsel, applies in trials by courts-martial. I am equally satisfied that Private Culp was not deprived of this constitutional right. At the outset of his trial, it was announced on the record that, in accordance with the alternatives available to him under the Uniform Code, supra, Article 38, 10 USC § 838, he chose to be defended by the appointed representatives whose statutory qualifications were so gratuitously called into question by the board of review.[1] The case before us, therefore, is precisely the same as Romero v Squier, 133 F2d 528 (CA 9th Cir) (1943), cert den 318 US 785, 87 L ed 1152, 63 S Ct 982, the holding in which has since been consistently followed. There, Judge Denman declared, at page 531:

"We hold that an Army officer, chosen, as here, by the accused, admitted by a court-martial to practice for him the arts of a military defense, need not also be admitted to practice by some civil court, in which military law may never have had the slightest consideration, to be the 'counsel' in a court-martial for which the Sixth Amendment makes provision. So far as concerns the Sixth Amendment, a court-martial counsel, chosen by the litigant and accepted by that body to prosecute or defend litigation there, is the same kind of officer at the bar of that court as is one entitled to practice at the bar of any other court. Cf. Dynes v Hoover, 20 How 65, 82, 15 L ed 838."

To say that a practice is constitutional is not an endorsement of its wisdom, and when my brothers speak of the training which every officer receives in military law, I understand them to intend only an exposition of the manner in which the anomaly of laymen practicing criminal law developed, rather than to place upon it the stamp of their approval. Indeed, twelve years' experience under the Uniform Code of Military Justice dictates the need to provide accused tried by special courts-martial and subjected to the heavy consequences of a bad-conduct discharge with counsel who possess legal training and are bound by the ethical obligations of our profession.

An officer of the armed services of necessity cannot receive the training required to perform adequately as counsel for an accused. At the most, he receives a general orientation course in military law during his attendance at various service schools or takes a few sub-courses in various aspects of its administration. At no time is he subjected to the rigorous and intensive process which fits one to become the advocate of an individual enmeshed in the toils of the criminal law. To me, it is just unthinkable to conclude that the best intentioned layman can be taught by attendance at a few generalized lectures to become a capable representative of another in a criminal prosecution. The argument is the same as if one taking a course in business law attempted to represent a large corporation in a merger or antitrust proceedings. And, as military

[1] The Government informs us in its brief that the board of review refused to consider affidavits by trial and defense counsel, to the effect that accused was fully advised of his right to request the services of a military attorney to represent him at the trial. Cf. United States v Ferguson, 5 USCMA 68, 17 CMR 68; Code, supra, Article 38.

**219**

appellate authorities well know, the result usually looks like something intended for entertainment at a church social. Indeed, the board of review sounded in this very case the tocsin call of multiple prejudicial error!

Aside from the inability of an officer counsel to perform his duties because of lack of proper grounding in law, there is also the important question of the ethical responsibilities imposed by our profession upon its members. Laymen will never understand an attorney's devotion to the interests of an "obviously guilty" client or the single-minded loyalty to the latter's cause which almost unexceptionally characterizes the practice of law. Too often, it must seem to the officer untrained in the law that his duty lies in the direction of the armed force to which he belongs rather than to the accused whom he represents, and there has not been inculcated in him any of the principles which so naturally form a part of the legal profession and which have impenetrably shielded the client's cause through the ages. It is difficult enough for a military lawyer to withstand the pressures exerted against his principal in the name of discipline and authority. See United States v Kitchens, 12 USCMA 589, 592, 31 CMR 175, 178. It seems to me well nigh impossible for one untrained both in the law and the inviolable standards of the legal profession to put to one side what he might conceive as his responsibility to the service and devote himself entirely to the interests of an individual whom he may privately think undesirable.

Nor, as the Chief Judge states, is automatic appellate review a substitute for utilization of legally trained counsel. As was recently noted by Senator Sam J. Ervin, Jr., a distinguished lawyer, jurist, and legislator, on the floor of the United States Senate:

". . . In the event the accused is sentenced to a bad conduct discharge by a special court-martial, there will be extensive appellate review of the findings and sentence pursuant to articles 66 and 67 of the Uniform Code, 10 USC, sections 866, 867 . . . ; but this is a review 'on the basis of the entire record.' *If evidence or information favorable to the accused has not been placed in the record by his counsel who, by reason of his lack of legal training, may not recognize what evidence would probably benefit the accused—then the appellate defense counsel are unable to take advantage thereof in the accused's behalf.*" [Emphasis supplied.] [109 Cong Rec 13354 (daily edition August 6, 1963).]

The many guilty pleas which we have reviewed on the basis of skimpy transcripts bear eloquent witness to the cogency of Senator Ervin's comments. How are we to know the real truth of the matters involved, if the accused, upon the advice of a non-lawyer, chooses to confess his guilt judicially and nothing is placed in the record to support the validity of his plea except a formula prated from the Manual for Courts-Martial, United States, 1951? We can go only upon the record in measuring its legal sufficiency to support the findings and sentence. Yet, we are truly ignorant of what might have been done had the accused's evidence been viewed by an attorney thoroughly versed in the law and bound by the sanctions of the Canons of Ethics to advise and counsel with his client in the best traditions of Anglo-American advocacy.

The Army long ago recognized the basic unfairness in sentencing an accused to a bad-conduct discharge when he was represented by lay counsel. Soon after the Code became effective, it took steps to eliminate the penalty in special courts-martial by forbidding the appointment of reporters to prepare the necessary verbatim record of trial. See AR 22–145, and Code, supra, Article 19, 10 USC § 819. In like manner, the Air Force, as Judge Kilday points out, has provided attorneys to represent both the Government and the accused in those cases in which the latter may be subjected to such severe punishment.

We have ourselves decried the dangers in lay practice of law. In consequence, we have resolutely refused to invoke the doctrine of waiver in those instances in which the accused has not

been represented by trained counsel. United States v Kelley, 7 USCMA 584, 23 CMR 48; United States v Hatter, 8 USCMA 186, 23 CMA 410; United States v Johnson, 14 USCMA 75, 33 CMR 287. And in a related area, we have pointed out that, "Law books unnecessarily in the hands of laymen may be as dangerous to the proper administration of justice as scalpels in the hands of laymen may be to the success of major surgery." United States v Kentner, 12 USCMA 667, 669, 31 CMR 253, 255.

It is not surprising, therefore, to find legislation pending before the Congress to eliminate the role of the non-lawyer as counsel in special courts-martial. Such is but one of the results of an extensive investigation into the administration of military justice conducted by the Senate Subcommittee on Constitutional Rights. In the words of its distinguished Chairman, Senator Ervin, the penalties suffered by an accused awarded a bad-conduct discharge warrant "the assistance of a qualified attorney" at his trial. 109 Cong Rec, supra, at page 13351. In light of the fact that there is scant difference between the disgrace and disabilities encountered by one so sentenced and one receiving a dishonorable discharge, I can only note my full agreement with the need for real legal assistance in these cases and my hope that the use of untrained officers as counsel will soon join those other anachronisms with which the history of military law is studded.

Again, in the Senator's words, "No objective could be more important at the present time than to protect the constitutional rights of the men and women in uniform who stand ready to protect the Constitution of the United States." 109 Cong Rec, supra, at page 13353.

With these observations, I concur in the result which may brothers reach.