UNITED STATES, Appellee

v

JOSEPH P. KAUFFMAN, Captain, U. S. Air Force, Appellant

14 USCMA 283, 34 CMR 63

285

No. 16,824

December 13, 1963

*George W. Latimer, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Calvin A. Behle, Esquire,* and *Colonel Daniel E. Henderson, Jr.*

*Lieutenant Colonel Robert M. Haynes* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

### Opinion of the Court

KILDAY, Judge:

We have before us a case in which a captain of the Air Force stands convicted of having conspired with secret service agents of the so-called East German Democratic Republic[1] to deliver to them national defense information relating to the United States, of agreeing to act as an agent of the East German Secret Service, and of violation of a general regulation by failing to report attempts by Russian and East German agents to induce him to reveal security information contrary to the best interests of the United States. If

---

[1] Hereinafter we shall refer to the individuals involved simply as East German authorities.

guilty, as presently adjudged, this conduct is reprehensible and indefensible. On the other hand, the case brings before us massive and deliberate violations of appellant's constitutional rights under the Bill of Rights, during the course of the investigation by the Office of Special Investigations. Paradoxically, such violations are admitted and not denied.

Five of the assignments of error, in various forms, present questions of alleged unlawful search of appellant's quarters and eavesdropping by the OSI upon appellant's telephone conversations with his civilian counsel. We shall consider the assignments together and advert, also, to irregularities in the investigation and trial of the case.

At the trial the prosecution offered a search warrant issued by a United States Commissioner in California for the search of a dwelling in Atwater, California, not upon a military installation, identified as the residence of appellant. An out-of-court hearing was held as to all matters surrounding the search of appellant's private off-base residence or quarters. It was developed that after the affidavit for the search warrant was filed with the United States Commissioner, the warrant was issued and placed in the hands of a Deputy United States Marshal. The warrant was executed by the Deputy Marshal, assisted by agents of the OSI. It was further shown that, prior to the application for search warrant, on four separate occasions agents of the OSI entered the private quarters of appellant during his absence. The entry on each occasion was at about 1:00 a.m., and was in each instance made through a window. Prior to these entries appellant had been sent, under orders, on temporary duty. Being under investigation for espionage, it is difficult to perceive the nature of such duty. The conclusion is inevitable that he was ordered away that the agents might conduct their illegal nocturnal prowlings without danger of apprehension. Each entry appears to have been made by some three agents, who spent a total time of ten to twelve hours therein. While in the house, they searched for evidence against appellant and photographed or mechanically copied any and all of appellant's personal papers which suited their fancy. Notwithstanding the meticulous search on four occasions by three-man teams, the OSI agents professed to have discovered absolutely nothing in the way of evidence. The only authority for such searches claimed was, "I did that under the authority of my superiors."

Some eight or nine days after the last entry into appellant's house, the affidavit for search warrant was made. Oddly enough, none of the six and more OSI agents on the spot made that affidavit. It was made by agent Reed, rather newly arrived from Germany. However, Reed had been to Castle Air Force Base and had heard some talk about the illegal entries to which he paid little attention. He had also been to Washington and conferred with a Mr. Levy, the OSI official in charge of the case and who had originally authorized the OSI agents to illegally prowl appellant's quarters. Notwithstanding the solemn oath of the OSI agent in charge of the four searches that no evidence pertaining to the case was found in the house, his OSI colleague, Reed, made solemn oath before the United States Commissioner that he had reason to believe that a long list of evidentiary matters were concealed in the house previously searched. There is some indication in the record that the appellant may have returned to his quarters for a short period of time between the third and fourth illegal entries. However, prior to the time of the fourth illegal entry and at the time of the execution of the warrant, appellant was continuously in custody at Castle Air Force Base.

Admittedly, the most important item sought was a notebook containing the name and address of Klara Weiss, the receipt of which is charged to have been an overt act of the conspiracy. The OSI agent in charge stated that he had in each instance of the illegal searches been looking for the name "Klara Weiss" and had not found it.

**287**

But lo and behold, during the legal search with a warrant, the notebook containing the name was found promptly! By whom? By the agent who had searched for it on four nights. Where? In appellant's top dresser drawer.

But this is not all. Appellant was in custody and confined to the base hospital at Castle Air Force Base. OSI agents had rigged recording devices in his hospital room to tape everything said in the room. They blandly admitted they had taped appellant's side of a telephone conversation with his civilian lawyer. They equally blandly admitted that an air policeman on duty outside his room eavesdropped on appellant's conversations with his lawyer and reported the content to the OSI.

All of these violations are dismissed by the violator with the simple statement that nothing illegally seized had been placed in evidence. Those who assume such cavalier attitudes should be made aware of the doctrine of the fruits of the poisoned tree and be required to read Silverthorne Lumber Co. v United States, 251 US 385, 64 L ed 319, 40 S Ct 182 (1920).

The eavesdroppers on conversations with lawyers, should be referred to Coplon v United States, 191 F2d 749 (CA DC Cir) (1951). They could also profit from a reading of the uniform condemnation of "bugging" or taping conversations contained in Lanza v State of New York, 370 US 139, 8 L ed 2d 384, 82 S Ct 1218 (1962). An example of things to come is available to investigators in State v Cory, 382 P2d 1019 (Wash) (1963), in which the drastic remedy of dismissal of the prosecution was imposed in a case in which the sheriff taped a conversation between the accused and his lawyer in the jail.

As another indicia of the attitude which pervaded this prosecution, note should be made of the fact that individual defense counsel detected signaling between the German defector witness and someone in the courtroom. Signaling was denied, in that instance, by the witness, but he did admit to an arrangement with a Mr. Frank not to identify the camp where he was located. Frank is not further identified nor was that subject further pursued. In another instance, individual defense counsel complained to the law officer of signaling. At an out-of-court hearing, trial counsel admitted to the law officer that he had arranged a system of signals between himself and a Mr. Smith, not further identified, under which Smith would withdraw his handkerchief from his pocket to alert trial counsel to testimony involving restricted information. We are amazed that in the second half of the twentieth century a colonel, Judge Advocate, should admit a system of signals in a courtroom in connection with the trial of a serious criminal matter. It must be said for the law officer that he promptly banished "Mr. Smith" from the courtroom.

The protections of the Bill of Rights are not reserved for those never suspected, charged, or tried for criminal violations. Indeed, persons of such rectitude have scant need to call upon those protections. Only those in the toils of the law have occasion to resort to those rights. We regret that we cannot call to our command words in which we can adequately condemn the illegal procedures revealed by this record. If endowed with that facility, we would utilize words bearing the connotation of those used by Mr. Justice Brandeis in Olmstead v United States, 277 US 438, 72 L ed 944, 958, 48 S Ct 564 (1928).

In that the record contains multiple errors calling for the reversal and dismissal of two of the charges before us and that the remaining charge is not, and could not be, affected by such conduct, we proceed no further as to violations of constitutional rights. United States v Culp, 14 USCMA 199–208, 33 CMR 411; Lanza v State of New York, supra.

Factually the record reflects that, upon the termination of a one-year tour of duty in Greenland, appellant was ordered to duty at Castle Air Force Base, California. His orders granted him thirty days delay en route

with authority to visit England, Scotland, Ireland, France, Italy, Spain, Luxembourg, Austria, Germany, Belgium, Netherlands, and Switzerland. The orders were silent as to visiting Berlin and designated no city in any of the countries he was authorized to visit.

Appellant proceeded to Paris and thence to Hamburg. While in Hamburg, he decided to visit Berlin. He exhibited his orders and ID card at the ticket office, purchased a ticket and boarded the train. Some time after the train departed Hamburg, uniformed East German agents came through the train examining documents of passengers. When appellant produced his ID card and orders, the agents removed him from the train.

Subsequent to his removal from the train appellant was taken to an isolated and secured house, into a second-floor room thereof. He was questioned by Guenter Maennel and Hans Bergmann, both officers of the East German Secret Police, through Sonja Eiserbeck, also a lieutenant of such secret police. It is undisputed that at the outset these people identified themselves to appellant as members of the East German Peoples' Police. Appellant contended it was not revealed to him that they were secret police until the final conversation, some days thereafter. At the trial, Maennel testified that such revelation was made on a day prior to the last conversation, but admitted he had testified in accord with appellant's contention at the Article 32 hearing.

Maennel and Bergmann questioned appellant for some time at the first session in the second-floor room. Thereupon a Russian agent entered the room. Maennel and Bergmann retired, and the Russian proceeded to question appellant in fluent English. The questioning led to loud talking, shouting, and table pounding between the Russian and appellant. The Russian returned to the first floor where Maennel and Bergmann were waiting, and later Lieutenant Eiserbeck, the interpreter who had remained in the room while appellant and the Russian were conversing, returned to the first floor and handed some papers to the Russian. These were, in turn, handed to Maennel and Bergmann and they, with Eiserbeck, returned and again questioned appellant in German, with Eiserbeck acting as interpreter. Thereafter he was shown to a bedroom in the house and spent the night there with a guard at his door.

The next day the interrogation continued by Maennel and Bergmann, with Eiserbeck continuing to serve as interpreter. Finally, appellant was directed to sign a document in English and another one in German. He understood no German, and could not read the document in German. Appellant contends the document in English contained his name, rank, serial number, names of his brothers, and the names of three American colonels, which had been mentioned in previous conversations, a statement that he was not a spy and had not been mistreated while in German custody. Appellant contended it contained no military information. Maennel stated that in addition to the information detailed by appellant, the document in German contained information as to national defense of the United States, such as characteristics of officers in Greenland, estimate of personnel there, the mission, types of planes, and other such matters. Other than isolated words, Maennel can neither speak nor read English.

Appellant initially refused to sign either document. After additional questioning and a threat that he would not be released until he signed the documents, appellant signed both of them. However, he was not immediately released and was advised he would not be until he gave his word as an officer of the Air Force that he would return next day. He gave such commitment, was directed to the hotel at which he should stay in West Berlin, taken to the railroad station, and given a ticket. He boarded the train, returned to West Berlin, and stayed at the hotel designated by the Germans.

Staggering credulity, appellant did

return to East Berlin at the time appointed. He was met by Maennel and Bergmann. The three went to a cafe for coffee, cognac, and social conversation. Appellant again returned to East Berlin the same evening, as agreed, and the three proceeded to enjoy the night life of East Berlin, primarily at a night club, where they drank, danced, and with difficulty conversed—though they did not speak each other's language they were able to make themselves understood. About 1:00 a.m. appellant was driven to the railroad station. En route they sang the "Internationale," Maennel stated, while appellant stated he sang "I've been working on the railroad" and "Its only a beer bottle." He returned to West Berlin. The next day he returned to East Berlin for extensive sight-seeing with Maennel and Bergmann. That night he returned to West Berlin.

The following day, for the fourth time, appellant returned to East Berlin, was met at the train station by Maennel and Bergmann and escorted to their car. Lieutenant Eiserbeck, the interpreter who had been present at the first meeting, but at none of the intervening social meetings of the three, was seated in the car. The group proceeded to an apartment, stated at that time to be Maennel's residence, but actually a place maintained by the secret police for interrogation.

After lunch, conversations began. Appellant contends that for the first time his companions revealed themselves as secret police rather than East German Civilian Peoples' Police. All agree that the Germans produced a document denominated a "contract" under which appellant would agree to serve as an East German secret agent to secure and communicate military information to the East Germans. All agree that appellant was much disturbed by this development and appellant states he was greatly agitated, disturbed, and ejaculated "Oh my God." All agree that appellant refused to sign the document and that he never signed the same. Maennel stated that instead of signing the

document appellant agreed to conform to the terms thereof, confirmed by a handshake and a sip of wine. Appellant denies that he entered into any agreement. Details of this meeting will be more completely stated hereinafter. After this meeting appellant returned to West Berlin, spent the night, left by air the following morning, completed his European tour, and finally reported to his new station at Castle Air Force Base.

In June 1961, Maennel defected to West Berlin, after negotiation with American officials, and narrated his version of the five interviews with appellant above mentioned. At the time of trial, Maennel was in American custody, stated to be voluntary; and was receiving lodging, food, an allowance for clothing, and was being paid 400 German marks per month.

After receiving this information from Maennel, Air Force officials. embarked upon a vigorous inquiry into the activities of the appellant. The nature of these inquiries will be further developed in connection with our discussion of the various issues before us.

Proceedings were instituted and appellant, over his protest and the protest of his counsel, was removed from Castle Air Force Base to Germany for an Article 32 hearing and trial.

Referred for trial were charges and specifications substantially as follows:

Charge I: Violation of Article 81, Uniform Code of Military Justice. Specification, conspiracy with Maennel, Bergmann and Eiserbeck for the communication of information relating to the national defense of the United States to representatives of East Germany.

Charge II: Violation of Article 92, Uniform Code of Military Justice.

Specification 1, violation of a general regulation by travelling from West Germany, through East Germany, without proper orders.

Specification 2, violation of a general regulation in that having

290

knowledge of attempts by agents of Russia and East Germany to induce him to reveal information contrary to the security and best interests of the United States, and to cultivate him socially and otherwise failed to notify his superior or commanding officer of such attempts.

Charge III: Violation of Article 133, Uniform Code of Military Justice. Specification, in that he agreed with Maennel, Bergmann and Eiserbeck to act as an agent of the East German Secret Service and to do specified things.

Charge IV: Violation of Article 134, Uniform Code of Military Justice. Specification, in that he communicated to Maennel information relating to the national defense of the United States with reference to certain particulars therein mentioned.

Appellant was arraigned before a general court-martial convened at Weisbaden, Germany, on April 10, 1962.

In response to appellant's motion for appropriate relief, the law officer dismissed specification 1 of Charge II, relating to travel from West Germany through East Germany, without proper orders.

Contrary to his plea of not guilty, the appellant was convicted of the remaining charges and specifications and sentenced to be dismissed from the service, to forfeit all pay and allowances, and to be confined at hard labor for twenty years.

The convening authority approved the sentence. A board of review in the office of The Judge Advocate General of the Air Force dismissed Charge IV relating to the communication of national defense information. The board of review affirmed the other charges and specifications, but reduced the confinement portion of the sentence from twenty years to ten years. As the case reaches us, appellant remains convicted of: (1) Conspiracy; (2) Violation of a general regulation by failing to report contacts with foreign agents; and (3) Agreeing to act as an East German Agent.

In his petition to this Court for review, appellant included thirty-six assignments of error. This Court granted eighteen of those assigned and formulated an additional assignment.

In the interest of clarity, we shall consider each charge, and its specification, rather than attempting a separate consideration of the numerous assignments.

### Charge I and Charge III

At his trial, appellant moved "to dismiss Charge I on the grounds that it does not state an offense of conspiracy or any other offense." The law officer overruled the motion and the question is before us on an assignment of error. Appellant argues that the specification does not *allege* an overt act.

The specification alleges that appellant did conspire with the other named individuals to commit an offense, to wit:

". . . wrongful and unlawful communication to representatives and agents of the so-called German Democratic Republic of information relating to the national defense of the United States, which the said Captain Joseph P. Kauffman had reason to believe would be used to the injury of the United States and to the advantage of foreign nations, to wit: the Union of Soviet Socialist Republics and the so-called German Democratic Republic. . . ."

The specification alleges two overt acts in the following language:

". . . and in order to effect the object of the conspiracy said Captain Joseph P. Kauffman did receive and accept from the said Guenter Maennel the name and address of Klara Weiss in West Berlin, Germany, as a medium of contact with the said representatives and agents, and the said Guenter Maennel did prepare and deliver to his superiors in the East German Secret Service for transmission to agents of the

291

Union of Soviet Socialist Republics a report of all contacts and dealings between the accused and his afore-named fellow conspirators."

Article 81, Uniform Code of Military Justice, 10 USC § 881, provides:

"Any person subject to this chapter who conspires with any other person to commit an offense under this chapter shall, if one or more of the conspirators does an act to effect the object of the conspiracy, be punished as a court-martial may direct."

Section 371, Title 18, United States Code, contains a provision, identical in effect, as to the overt act in conspiracy. The same reads:

". . . and one or more of such persons do any act to effect the object of the conspiracy. . . ."

It is clear that under both statutes an overt act must be alleged and proven. However, "It is not necessary that the overt act or acts should appear on their face to have been acts which would necessarily have aided in the commission of the crime." 15 CJS, Conspiracy, § 88b.

In Remus v United States, 291 Fed 501 (CA6th Cir) (1923), the following appears:

". . . The further averments of the indictment last above quoted specifically charges that the overt acts alleged were committed to effect the object of said unlawful and felonious conspiracy. Certainly this language is subject to no construction other than that the overt acts charged were committed after the conspiracy was formed, while it was still in existence, and in furtherance of its unlawful purpose."

Mr. Justice Holmes stated in Frohwerk v United States, 249 US 204, 209, 63 L ed 561, 565, 39 S Ct 249, 251 (1919):

". . . It is argued that there is no sufficient allegation of intent; but intent to accomplish an object cannot be alleged more clearly than by stating that parties conspired to accomplish it. The overt acts are alleged to have been done to effect the object of the conspiracy, and that is sufficient under § 4 of the Act of 1917."

See also Stephens v United States, 41 F2d 440–443 (CA9th Cir) (1930), cert den, 282 US 880, 75 L ed 777, 51 S Ct 84; Haywood v United States, 268 Fed 795 (CA7th Cir) (1920); De Lacey v United States, 249 Fed 625 (CA9th Cir) (1918), LRA 1918E.

It is clear that Charge I and its specification adequately allege the offense of conspiracy and the overt acts thereof. We sustain the action of the law officer in overruling the motion and the action of the board of review in affirming that action.

The next assignment of error to be considered presents the question of the insufficiency of the evidence to support the findings of guilty of Charge I, the conspiracy charge. This assignment presents a more difficult and important question.

Throughout the consideration of this assignment it must be borne in mind that the object or purpose of the conspiracy was alleged to be, "the wrongful and unlawful *communication* to representatives and agents of the so-called German Democratic Republic of information relating to the national defense of the United States." (Emphasis supplied.)

The evidence shows, without dispute, that all of the transactions involved in this charge took place in one conversation and in one place. The overt act alleged of receiving and accepting the name and address of Klara Weiss was during this identical conversation. Maennel testified that at that time he furnished appellant with that information as a "cover address"; that he first gave the name and address orally and then wrote it in appellant's notebook.

Without dispute, the evidence relied upon by the Government, but denied by appellant, shows that the conspiracy or scheme was that appellant was to

292

collect information and communicate the same to the East German Secret Service and that he was to communicate the same through contact with the "cover address" of Klara Weiss. The Government presents much argument that the receipt and acceptance of the "cover address" was an overt act separate from the agreement. However, no evidence to that effect is submitted. Clearly this is insufficient to constitute an overt act in furtherance of the alleged agreement.

Conceding that an overt act may coincide with the formation of the conspiracy, as well as follow the same, still it is required that the overt act be a "manifestation that the conspiracy is at work." United States v Choat, 7 USCMA 187, 21 CMR 313; Manual for Courts-Martial, United States, 1951, paragraph 160.

We pause to consider the second overt act alleged. That is, that Maennel prepared and transmitted to his superiors for transmission to Russia a report of all contacts and dealings between appellant and the other alleged conspirators. The evidence is essentially in accord with the allegation. It does not in any way point out in what manner such a report could effect the object of the conspiracy or how it could be a manifestation that the conspiracy is at work. That such report was to be later transmitted to Russian agents adds nothing to that manifestation. We cannot conceive in what manner the transmission of a report within the secret police organizations of the collaborating communist governments could effect the object of a conspiracy to collect information within the United States to be communicated by appellant to Maennel. Again, the Government presents argument, but no citation of authority. That such conduct does not constitute an overt act, under the evidence in this case, will be made clear by our further discussion and citation of authority.

That this question may be considered in proper perspective, we quote (as equally applicable here) the following from Braverman v United States, 317 US 49, 53, 87 L ed 23, 28, 63 S Ct 99–101 (1942):

". . . But it is unimportant, for present purposes, whether we regard the overt act as a part of the crime which the statute defines and makes punishable, see Hyde v United States, 225 US 347, 357–359, 56 L ed 1114, 1122, 1123, 32 S Ct 793, Ann Cas 1914A 614, or as something apart from it, either an indispensable mode of corroborating the existence of the conspiracy or a device for affording a locus poenitentiae. . . ."

The above noted distinction is not important here for the reason that in either case the result is the same. This is recognized in Hyde v United States, 225 US 347, 56 L ed 1114, 32 S Ct 793, in the following language:

". . . The conspiracy, therefore, cannot alone constitute the offense. It needs the addition of the overt act. *Such act is something more, therefore, than evidence of a conspiracy.* It constitutes the execution or part execution of the conspiracy, and all incur guilt by it, or rather complete their guilt by it, consummating a crime by it cognizable then by the judicial tribunals, such tribunals only then acquiring jurisdiction." [Emphasis supplied.]

A very comprehensive discussion of conspiracy and overt acts therein will be found in Marino v United States, 91 F2d 691, 113 ALR 975 (CA9th Cir) (1937), cert den, sub nom, Gullo v United States, 302 US 764, 82 L ed 593, 58 S Ct 410. We quote from *Marino*, supra, as follows:

"The crime is completed when an overt act [to] effect the object of the conspiracy is done by at least one of the conspirators. *An overt act is something apart from the conspiracy,* and is an 'act to effect the object of the conspiracy.'" [Emphasis supplied.]

The following is from United States v Grossman, 55 F2d 408–410 (ED NY) (1931):

**293**

"The overt act must be entirely independent of the conspiracy. It must not be one of a series of acts constituting the agreement, but it must be a subsequent independent act following a complete agreement or conspiracy, and done to carry into effect the object of the original agreement."

Substantially the identical language of *Grossman,* supra, appears in United States v Richards, 149 Fed 443–446 (DC Neb) (1906). We believe that both of those courts expressed the rule in clear and concise language. See also Williams v State, 16 Okla Crim 217, 182 Pac 718 (1919); State v Bennett, 81 Okla Crim 206, 162 P2d 581 (1945); Joplin Mercantile Co. v United States, 236 US 531, 59 L ed 705, 35 S Ct 291–292 (1915).

There is no evidence in this record that an overt act was committed by any party to the alleged conspiracy.

The record contains matters of further prejudice to the appellant as to Charge I and Charge III, as well.

Appellant entered specific objections to the testimony of the witness Maennel as to what was said in various conversations between appellant, and Maennel and Bergmann through the interpreter, Eiserbeck, on the ground that the same constituted hearsay. All of these objections were overruled. At the court-martial, Maennel testified through an interpreter. He did not claim that he could understand, speak, or read English. Rather, he testified quite positively that he could recognize a few words when spoken or when he saw them in writing. It is quite clear that he could not understand the context of a spoken statement or a written document. There is no contention to the contrary. Other than appellant, only Maennel gave testimony as to the conversations out of which Charge I and Charge III, now before us, arise. Therefore, the decision of the question of the admissibility of that evidence is dispositive of those two issues.

Paragraph 141, Manual for Courts-Martial, United States, 1951, reads as follows:

"As a general rule, a statement made through an interpreter may be proved only by the testimony of the interpreter or by other evidence of the statement itself, and may not be proved by evidence of the interpreter's translation. However, as an exception to this general rule, such a statement may be proved by evidence of the interpreter's translation if the interpreter was acting as the agent of the person who made the statement and such person is the accused, or is a co-conspirator or accomplice of the accused and made the statement in pursuance of the common venture, or is a witness and proof of the statement would tend to impeach his credibility."

This provision of the Manual has the force of law. United States v Smith, 13 USCMA 105, 32 CMR 105. In addition, the Manual states, accurately, the universally recognized rule on this subject. Thus, in 1 Wharton, Criminal Evidence, 12th ed, § 254, page 586, we read the following:

"In contrast, a witness cannot testify to the extrajudicial statements of another person, spoken in a language not understood by him, but translated for him by an interpreter, as such repetition by the witness of the interpreter's statement of what the other person said is hearsay. Accordingly, testimony as to what a person said out of court in a foreign language can only be admitted when testified to by a person who of his own knowledge understood what the third person said."

In Wigmore, Evidence, 3d ed, § 1810, the rule is stated as follows:

"Where a witness on the stand is asked to testify to the *words* of A *uttered out of court,* as translated to him by M interpreting between them, the witness is not qualified by personal knowledge of A's utterances (*ante,* § 668), and may not testify; the interpreter M is the only qualified witness. But if A, whose utterances are to be testified to, is a party opponent, then he may be

regarded as having made M his agent to translate, and thus M's translations are admissions (*ante*, § 1078), usable against A."

The question of statements made through an interpreter was before this Court in United States v Plummer, 1 USCMA 373, 3 CMR 107, and we said:

"It is the general rule that a statement made through an interpreter may be proved only by the testimony of the interpreter. Manual for Courts-Martial, 1951, paragraph 141; Wigmore, Evidence, § 668. There is, however, a well-recognized exception to the general rule. If the interpreter may be considered the agent of the person making the statement, the translation heard by the other party may be received in evidence. MCM 1951, paragraph 141. This exception has also been extended to the situation where the interpreter acts as the agent for both parties. Commonwealth v Vose, 157 Mass 393, 32 NE 355; Wigmore, Evidence, Third Ed., § 1810. There are circumstances here which would indicate that the interpreter was acting as the agent for both parties, but we need not decide this issue." [Cf. United States v Annal, 13 USCMA 427, 32 CMR 427.][2]

The board of review held there was ample evidence to support the conclusion that appellant agreed to Eiserbeck's employment as interpreter during the conversations, thereby constituting her his agent for such purpose. We proceed to determine whether there is evidence in this record that the "interpreter was acting as the agent of" the appellant. Paragraph 141, Manual for Courts-Martial, supra. There seems to be no material disagreement between the Government and appellant as to the rule of evidence involved. The dispute as to its application rests upon a factual determination as to the presence in the record of such evidence.

First, we observe there is nothing in the record to indicate that appellant ever stated, was asked, or specifically consented to the use of Miss Eiserbeck, a lieutenant in the East German Secret Service, as interpreter. If such a conclusion is to be reached it must be by inference from other facts in the record. Any designation or acceptance .of her by appellant as his agent must also be by inference. It is germane to note that at the time of all conversations involved, Maennel, Bergmann, and Eiserbeck were devoted, energetic, and efficient secret agents of East Germany. All three continued to be such until Maennel decided to be a traitor to his own country and enter the pay of the United States as an informer on United States personnel.

As guidelines to our determination as to the existence of such agency, we shall consider existing cases on this subject. In support of its holding the board of review cited Commonwealth v Vose, 157 Mass 393, 32 NE 355, 17 LRA 813 (1892). *Vose* is, perhaps, the most frequently cited case on this question. It is to be noted carefully that Mrs. Vose, wife of the defendant, was the interpreter. On this subject the court said:

"... Each impliedly agrees that his language may be received through the interpreter. *If nothing appears to show that their respective relations to the interpreter differ,* they may be said to constitute him their joint agent to do for both that in which they have a joint interest." [Emphasis supplied.]

The clause we have emphasized is of primary importance and has a peculiar bearing upon our determination of the existence of evidence justifying an inference of agency. In Gulf, C. &

---

[2] *Annal* is distinguishable from the present case on a number of grounds. In *Annal* the testimony had to do with "fresh complaint," a species of hearsay admissible under an exception; there was no objection by the accused at trial; the interpreter testified at the trial to substantially the same effect as the other witness and that testimony is cumulative. However, the quotation appearing on page 432 is incomplete. It omits the element that "such person is the accused." Clearly, the interpreter being the agent of the alleged injured party would not render such testimony admissible.

S. F. Ry. Co. v Giun, 116 SW2d 693, 116 ALR 795 (Texas) (1938):

". . . The authorities cited by that court in support of its holding that the evidence was erroneously excluded are those applicable when the parties agree upon an interpreter as the medium of their communication. Such is not the case here. The respective relations of the parties to Melisio were obviously different. It does not appear that the engineer even knew his statements were being interpreted into Mexican. . . . It appears from the record that Melisio accompanied Maria to the scene of the accident and was asked by her, and by her alone, to talk for her as interpreter. There is no evidence that the engineer agreed to accept the services of an interpreter or took recognition of Melisio in any way. If Maria was not qualified in the state of the record to testify of her own knowledge what the engineer said, her proffered statement of what Melisio said he said, was not competent and was correctly excluded, regardless of the correctness of the objection urged to its admission. Such testimony would have been nothing more than Maria's statement of what Melisio said."

In Kalos v United States, 9 F2d 268–271 (CA8th Cir) (1925), reversal of a narcotics conviction was ordered on the sole error of the admission in evidence of a conversation between a postmaster, the accused, and one Leventis. The conversation was in English, which accused did not understand, with accused's portion being translated by Leventis. The postmaster testified to the conversation. The record showed accused and Leventis to be acquaintances, and that the postmaster told Leventis to send accused for a package received in the mail for him. Leventis so informed accused who did not go to the post office. Leventis then went to the post office and phoned accused to come there, which he did. The Court of Appeals discussed the question of the admissibility of interpreted conversations and then stated:

"Defendant did not take Leventis

to the postmaster to act for him as his agent in conversation with the postmaster, and the statements made there in the English language by Leventis were not admissible."

In People v Chin Sing, 242 NY 419, 152 NE 248 (1926), the defendant, a Chinese who could not speak English, was in custody suspected of murder. The police called in two Chinese and, through them as interpreters, proceeded to interrogate defendant. At the trial, witnesses were allowed to testify that the interpreters said defendant gave various answers to their questions. The Court of Appeals held such testimony to constitute hearsay and its admission was the sole ground of reversal. The court said:

". . . Of course the evidence was hearsay (People v Lewis, 238 NY 1, 143 NE 771), and, with two possible exceptions the only cases cited by the people to sustain the admission of such evidence are cases where the interpreter had been selected by common consent of the parties endeavoring to converse or by the party against whom the statements of the interpreter were offered in evidence, and in such cases it was naturally held that the party against whom the statements were offered in evidence had made the interpreter his agent, and therefore within the ordinary rules of principal and agent was bound by his statements which could be proved by a third party. As has been pointed out, that is not at all this case."

It is to be noted that paragraph 141 of the Manual, supra, in providing the exception to the rule which permits the receipt of such testimony as admissible, states it "may be proved by evidence of the interpreter's translation if the interpreter was acting as the agent of the person who made the statement and such person is the accused." The Manual does not provide the manner in which ▪ such agency relationship is to be proved. Therefore, it is to be proved under the substantive law of agency. In Wigmore, Evidence, 3d ed, § 1078, it is stated:

"Upon the application of the principle to specific instances, it would be useless here to enter, for only the rules of the substantive law of Agency are involved."

With due regard for the guidelines established for the determination of this issue, we fail to find ■■■■■ ■ in this record any evidence to support a holding that the East German Secret Agent, Eiserbeck, was the agent of the appellant in translating the various conversations.

See also Gulf, C. & S. F. Ry. Co. v Giun, supra, and the annotation thereto appearing in 116 ALR at 800; Boyd v State, 78 Texas Crim 28, 180 SW 230 (1915); Cervantes v States, 52 Texas Crim 82, 105 SW 499 (1907); Turner v States, 89 Texas Crim 615, 232 SW 801 (1921); 20 Am Jur, Evidence, § 459.

The respective relations of appellant and Maennel to the interpreter were vastly different. Maennel produced the interpreter in connection with his conquest of appellant and brought her to the meeting. We note that the board of review dismissed Charge IV, alleging that appellant communicated to Maennel information relating to the national defense of the United States. In connection with that ruling, the board stated:

"After a most careful consideration of the matter, we do not find that Lieutenant Eiserbeck, the interpreter, was accused's agent on either 29 or 30 September 1960."

We believe the board of review was correct in reaching that conclusion. We also believe there is no evidence to sustain the decision of the board of review that the interpreter was the agent of the appellant on October 3, 1960.

Having held that Lieutenant Eiserbeck was the agent of the appellant in her interpretation of the conversation of October 3, the board of review found that it was not necessary to consider the contention of the Government that the parties at that time were co-conspirators. The simple answer to the Government's contention is that it cannot have it both ways. That is, it cannot contend the conversation of October 3 constitutes the conspiracy, and to secure its admission in evidence, contend that the conspiracy was already in existence.

The hearsay testimony should not have been admitted over appellant's objection.

Charge II

Charge II alleges a violation of a general regulation, in that having knowledge of attempts by agents of Russia and East Germany to induce him to reveal information contrary to the security and best interests of the United States, and to cultivate him socially, the appellant failed to notify his superior or commanding officer of such attempts.

First, we observe that the regulation involved is a general regulation, promulgated by the Department of the Air Force, Washington, D. C., "By order of the Secretary of the Air Force," over the signature of the Chief of Staff of the Air Force. There is no contest as to the authority to issue the regulation and its validity as a matter of general application to the Air Force. Appellant contends that compliance with the regulation would have required that he disclose self-incriminating information.

In sustaining the validity of the regulation, the board of review observed that the regulation requires only that Air Force personnel identify certain attempts and offers on the part of others; and that no acts on the part of the reporting individual are required to be reported. The board of review also observed there is nothing in the regulation which required appellant to admit his complicity with the foreign agents or otherwise disclose self-incriminating information. In this connection, the board of review cited United States v Smith, 9 USCMA 240, 26 CMR 20, in which this Court sustained a regulation requiring the driver of a motor vehicle involved in certain types of accidents to report the same. In that case, Judge Ferguson, in his concurring opinion, agreed such

**297**

regulation to be valid. However, he pointed out that accused did not report the accident and no issue was involved as to Article 31, Uniform Code of Military Justice, 10 USC § 831.

Statutes requiring that operators of motor vehicles report accidents in which they are involved have generally been sustained against an assault that they require self-incrimination. *People v Rosenheimer*, 209 NY 115, 102 NE 530 (1913); *Ex parte Kneedler*, 243 Mo 632, 147 SW 983 (1912); *State v Razey*, 129 Kan 328, 282 Pac 755 (1929); *Scott v State*, 90 Texas Crim 100, 233 SW 1097 (1921). Appellant, however, contends that the operation of a motor vehicle is a privilege which might be deprived him and not a right.

It must also be observed that appellant is a member of the armed forces and as such is subject to the orders of the President as Commander-in-Chief. His state, or status, as a soldier makes him subject thereto. *United States v Culp*, 14 USCMA 199, 33 CMR 411. In *United States v Field*, 193 F2d 92 (CA 2d Cir) (1951), a case involving the obligation assumed by those who provide bail, the court said:

> "It is not a new thing to hold that the privilege may be limited in various ways by a previous obligation otherwise assumed. Examples of limitations validly set upon its exercise are found in the various requirements for the disclosure of information set by the state as a correlative of the pursuit of certain activities. Thus doctors must report deaths and their causes, druggists must show their prescription lists, mine owners must report details of accidents in their mines, and motor vehicle operators must report details of collisions on the highway." [Emphasis supplied.]

So, too, a soldier, and appellant, particularly in accepting his commission, had previously assumed ▇▇▇▇ the obligation to obey the orders, directions, and regulations of his Commander-in-Chief. This regulation is a reasonable and necessary provision for the discipline and security of the Air Force and na-tional security. The regulation of the Secretary, through the Chief of Staff, is the regulation of the President. In the early case of *The United States v Eliason*, 16 Peters 291 (US 1842), the Supreme Court said:

> "The Secretary of War is the regular constitutional organ of the President for the administration of the military establishment of the nation, and rules and orders publicly promulged through him must be received as the acts of the executive, and as such, be binding upon all within the sphere of his legal and constitutional authority."

This regulation contains nothing to require the one reporting such contacts to incriminate him-▇▇▇▇ self. If, in the reporting, the appellant should incriminate himself, such is due to his own conduct and not a result of the regulation.

We conclude that the regulation is valid and not violative of appellant's rights as contended by him.

That there was an attempt to induce appellant to reveal information contrary to the security and best interests of the United States and to cultivate him socially is not in dispute. To prove his failure to report the same, the Government presented, and the law officer received in evidence, the duly authenticated certificate, signed by the custodian of the official records and reports, Office of Special Investigations, Headquarters, United States Air Force, under the pertinent regulation, that after diligent search he had found that no record or entry exists of a report having been made to anyone by appellant pursuant to such regulation.

The admissibility and probative effect of this certificate are exemplified in Manual for Courts-Martial, United States, 1951, paragraphs 143a(2); 143b(2)(f); 143b(2)(a); and 147a. We do not perceive the complaint of appellant that such certificate is too remote.

The general regulation, by its terms (paragraph 2), required that as soon as he is informed of activities covered thereby, each commander will report

298

the matter to the nearest OSI facility. OSI commanders are required to forward such information directly to the Director of Special Investigations, Headquarters, USAF. If no OSI services are available, commanders are required to report the matter directly to Headquarters, USAF. The authenticated certificate of the custodian of the records of OSI, Headquarters, USAF, that he has made diligent search of those official records and found that no record or entry exists of such a report by appellant, "may be received as evidence·that the fact did not exist or that the event did not occur." Paragraph 143a(2), Manual for Courts-Martial, supra; Rule 27, Federal Rules of Criminal Procedure; Rule 44, Federal Rules of Civil Procedure.

". . . Properly authenticated official records are *prima facie* evidence of the facts related in them. . . . While it is clear that more evidence could obviously have been produced, we are satisfied this proof was sufficient in law to permit the military jurors to infer guilt." [United States v Stone, 13 USCMA 52–56, 32 CMR 52.]

The evidence produced by the Government was sufficient to establish a *prima facie* case that appellant did not "notify his superior or commanding officer immediately upon learning" of the attempts. In this state of case, while the burden of proof remained on the Government, the facts being peculiarly within the knowledge of the appellant, he had the burden of going forward with proof that he had complied with the regulations. 1 Wharton, Criminal Evidence, 12th ed, § 14, pages 38 to 42; Wigmore, Evidence, 3d ed, § 2486.

Appellant testified as a witness in his own behalf. Prior to his taking the stand, defense counsel informed the court-martial that appellant would limit his testimony and would not testify as to Charge II. It should be observed that the content of the testimony upon direct examination and not the announcement of his limiting his

testimony would control. United· States v Hatchett, 2 USCMA 482, 9 CMR 112. In his direct testimony appellant testified at length and in detail as to attempts to induce him to reveal information contrary to the best interests of the United States and of attempts to cultivate him socially. He likewise admitted he had accepted social entertainment and detailed the time, place, and nature of such entertainment. However, he claimed he had not succumbed to such inducements and that the entertainment was entirely innocent.

On cross-examination the prosecution asked appellant whether he had reported such contacts in accordance with the regulation. Over objection of individual defense counsel, appellant was required to answer and stated he had not. Had he reported such contacts immediately, as required by the regulation, it would have been the strongest evidence possible to sustain his contention that he had resisted the inducements made to him. Conversely, failure to report has a strong bearing on his credibility in stating that he had resisted those inducements and had nothing to hide. In addition, we believe appellant's testimony opened the door for the question asked.

On direct examination, appellant accounted fully for his actions and movements on each occasion when he returned to West Berlin. Thus, appellant testified upon reaching West Berlin after his incarceration and questioning, he returned to the hotel, had something to eat, and went to bed. After his return from the second visit, he went back to his hotel. After returning to West Berlin from his third visit, he showered, read some books and magazines, went to an eating place, watched the floor show, and then returned and went to bed. And after the fourth visit to East Berlin, he went back to his hotel, took a shower and started to walk, and walked for a matter of hours. Then he went back to his hotel, showered and shaved, had a long dinner, and then went to some circus-type carnival, and then returned to his hotel.

The following morning he "got out of there," went to Templehof Airport and departed Berlin on Pan American Airlines. He effectively negatived any report, during this period of time, as required by the regulation.

Defense counsel places heavy reliance upon United States v Marymont, 11 USCMA 745, 29 CMR 561. This case is distinguishable from *Marymont*. In this regard, Judge Quinn's concurring and dissenting opinion contains a number of points with which I find myself in agreement.

We hold under the record in this case and in view of appellant's testimony upon direct examination, his negation of having reported these contacts while in West Berlin, and the fact that he had the burden of going forward with the evidence as to reporting, these assignments do not present error.

See United States v Kelly, 7 USCMA 218, 22 CMR 8; United States v Marymont, supra; Fitzpatrick v United States, 178 US 304, 44 L ed 1078, 20 S Ct 944 (1900); Powers v United States, 223 US 303, 56 L ed 448, 32 S Ct 281 (1912); Johnson v United States, 318 US 189, 87 L ed 704, 63 S Ct 549 (1943); Wigmore, Evidence, 3d ed, § 2276, page 438.

Charge II does not depend upon any of the inadmissible hearsay admitted at the trial and is not tainted by any of the errors and deficiencies herein noted. The decision of the board of review as to such charge must be affirmed.

There being no evidence in this record that an overt act was committed by any party to the alleged conspiracy in Charge I; the elimination of the hearsay testimony resulting in there being insufficient evidence to convict of either Charge I or III; the action of the board of review in affirming the conviction under these charges must be reversed. In accordance with Article 67(e), Uniform Code of Military Justice, 10 USC § 867, these charges must be dismissed.

Accordingly, the decision of the board of review as to Charge II and

its specification is affirmed. The decision of the board of review as to Charges I and III and their specifications is reversed and said charges are dismissed.

The record will be returned to The Judge Advocate General of the Air Force. A rehearing on sentence may be ordered or another board of review may reassess the sentence on the remaining finding of guilty.

Judge FERGUSON concurs.

QUINN, Chief Judge (concurring in part and dissenting in part):

The Government admitted its agents illegally entered the accused's house in the United States a number of times and made fruitless searches for evidence. These acts deserve the severe condemnation accorded them in Judge Kilday's opinion. They are most reprehensible and call for serious self-criticism and self-appraisal by the investigative agency and perhaps even the Department of the Air Force. However, Agent Reed, who submitted the affidavit for the warrant which resulted in the successful search, swore he acted only on the basis of certain statements made by the accused and information he personally obtained in Germany. The board of review scrutinized his testimony, and very carefully considered the surrounding circumstances, including Agent White's averment that the notebook had not been seen in the previous searches of the accused's home. It rejected appellate defense counsel's argument that the testimony was unbelievable as a matter of law; and exercising its "fact finding powers," concluded Agent Reed's affidavit was truthful. Judge Kilday's opinion suggests that further consideration of the issue might require a contrary conclusion.

I have no hesitancy in disregarding testimony which is inherently unbelievable, but I consider it unnecessary to review the issue from that standpoint. The record of trial shows the accused did not testify because he believed he was compelled to explain away the implications of the notebook. Rather, he testified as the result of

a deliberate decision to "tell his side of the story." See United States v Woodruff, 11 USCMA 268, 29 CMR 84. Before calling the accused to the stand, defense counsel made some preliminary comments on that decision. In part, he said:

"... In America, there is a presumption in favor of an accused if he does not testify; you cannot presume against him. But in this case we are not going to try to take advantage of that presumption and we are going to call Captain Kauffman to the stand to tell the story because we believe that he is the best man to present his side of the case. All parties have been waiting for the $64,000 question; the $64,000 question being, is Captain Kauffman going to tell his side of the story. Well, Captain Kauffman is, with one exception. That is, I am not going to let Captain Kauffman testify on the specification of Charge II."

The accused talked freely about the notebook, and his testimony in that regard is substantially similar to that of Guenter Maennel, the Government witness. Consequently, if the search in which the notebook was seized was tainted by the earlier illegal searches, the accused's own testimony eliminated any possibility of prejudice. United States v Woodruff, supra.

Turning to the points discussed in the principal opinion in connection with Charges I and III, I am constrained to disagree with some of the conclusions reached therein. So far as the conspiracy charge is concerned, if we were dealing merely with what Judge Kilday describes as "collaborating communist governments," the submission to Soviet authorities of a report of the arrangements between the accused and the East German agents would, in my opinion, be an act directly advancing the conspiracy.

Under the terms of the conspiracy agreement, as testified to by Guenter Maennel, the accused was not simply to collect and cache national defense information, but to *communicate* such information to agents of East Germany. No means of communication were agreed upon at the meeting of the conspirators. According to Maennel, the Weiss cover address was not for the transmission of the information, but merely "for maintenance of impersonal contact between Mr. Kauffman and me." Obviously, some realistic method of communication between the accused and the agents was essential if the purpose of the conspiracy was to be achieved. The accused was to be stationed in the United States. It is difficult to see how he could transmit his information to the East German agents, without the active assistance of Soviet agents. It is common knowledge that it is Soviet Russia not East Germany that maintains the elaborate communist bloc espionage apparatus, parts of which operate in the United States. Alerting Russian agents to the agreement negotiated with the accused would have been a vital, even essential, step in facilitating communication by the accused to East German agents of the national defense material obtained by him. In that event, the report to the Soviet agents would have been an overt act separate from the conspiracy, and one which directly and specifically advanced its purpose. However, we have more here than cooperating governments.

Maennel testified that his espionage agency was "supervised and controlled by agencies of the Soviet Government." The minute degree of that control is demonstrated by Maennel's testimony that his interrogation of the accused was "interrupted" by a Soviet intelligence officer; that while the Soviet agent questioned the accused he had to wait in the "downstairs" part of the house in which the interrogation was conducted; that on "order" of the Soviet agent, Maennel brought certain papers to the accused for signature; and when the papers were signed, the Soviet agent determined their disposition. It is apparent, therefore, that Maennel's report to the Soviet agents of the arrangements effected with the accused is not an overt act in furtherance of his agreement with the accused. Consequently, I agree with Judge Kilday that the Government failed to prove an overt act. I join in setting

**301**

aside the findings of guilty of Charge I and its specification and in the dismissal of that Charge.

The problem of the interpreter has two aspects. The first is concerned with Guenter Maennel's knowledge and understanding of the English translations conveyed to the accused and his responses thereto; the second deals with other translations. Whether the accused could or could not understand German is wholly immaterial to the evidence in the first group. For example, Maennel testified he told the accused on September 30th that he was an officer of the Secret Political Intelligence Service. This information was translated by Lieutenant Eiserbeck into English. Maennel said he understood part of the English translation. Asked to state the words he understood, he said, "That is, an officer from the Secret Political Intelligence Service. That was referring to me." He further testified that he understood the English translation of the words that he (Maennel) "work[s] against the USA for espionage." A similar situation exists in regard to the contents of a document which Maennel testified was submitted to the accused in two versions, one in German and the other in English. The accused read and signed the English version and looked at the German version. Maennel testified as to his knowledge of the English words in the English document. From his testimony, the court-martial could reasonably infer the two papers were identical.[1] Another such situation is the accused's identification of the bases at which he was stationed, and his pointing out, on an atlas produced by Maennel, his "future station" in the United States.

Maennel was not as ignorant of English as the defense contends. He said he had studied the language for about two hours a week for a period of about a year. At the beginning of Maennel's important testimony, defense counsel objected to Maennel's "capacity" to recognize words in the English version of the document signed by the accused. The law officer allowed defense counsel to test Maennel's facility with the language. Without apparent difficulty or hesitation—or at least none that was commented upon, or inquired into for the record by defense counsel—Maennel read eleven typewritten lines from the English translation of his Article 32 testimony. Asked whether he understood what he read, he replied, "About the sense—yes." Maennel admitted he had difficulty in carrying on conversations with the accused in English; but at a number of places in the record, he gave enough of the English version of his conversations to allow his testimony to come in as direct evidence, notwithstanding the conversations were also interpreted by Lieutenant Eiserbeck. On the evidence of Maennel's familiarity with English, and his recognition of specific English words, the law officer, in my opinion, correctly allowed his testimony into evidence on the matters noted and others of a similar nature.

Turning to the meeting on October 3d, and the heart of the conspiracy agreement, some of the evidence, such as the accused's references to the atlas in response to a request by Maennel, fall in the class mentioned above. Others belong to the second class. In my opinion, all the evidence relating to this meeting is admissible because there is ample testimony to support the conclusion that the accused agreed to use Lieutenant Eiserbeck as an interpreter. The meeting of October 3d, as the board of review correctly observed, must be separated from those at which the accused was interrogated on September 29th and 30th. In the interim period, the accused went sight-seeing, drinking, and dancing, with Maennel and Bergmann. They were together for hours at a time. They had difficulty in carrying on conversation, but nonetheless they sufficiently understood each

---

[1] It is reasonably inferable from the accused's own testimony that the two documents were in fact identical. Thus, he testified that while he looked at the English version "the interpreter read off the other version." He did not contend he detected differences; on the contrary, he described the German version as a "similar document." He only contended that the document contained less than Maennel said it did.

other for the type of activities they engaged in. October 3d was to be different.

Before the accused left East Berlin on Sunday night, October 2d, he was told in *English*, without the aid of an interpreter, "[p]art by Captain Bergmann and part by" Maennel that they had all "discussed our interesting problems during the past days and that he [the accused] knows where we come from and what we are doing . . . and that" the time had come for another meeting "to where a contract should be made concerning the future."[2] Manifestly, this was to be a meeting for a serious discussion. It was not to be a meeting between strangers, under conditions of hostility such as characterized the interviews on September 29th and 30th. Instead, it was to be a meeting between friends intent upon effecting a permanent arrangement for an important undertaking. Consequently, it is reasonably inferable that the accused intended to make himself completely and clearly understood to the others, and to have the others understand him in the same degree. In light of these circumstances, the law officer and the board of review were entirely justified in concluding the accused consented to the use of the interpreter at this meeting. I would, therefore, affirm the findings of guilty of Charge III and its specification.

As to Charge II, I agree generally with Judge Kilday's opinion. The accused insists his case is indistinguishable from United States v Marymont, 11 USCMA 745, 29 CMR 561, in that he was interrogated about an offense concerning which he had elected not to testify. The argument merits additional comment.

In *Marymont*, the accused was charged with premeditated murder and adultery. At trial, he elected to testify only as to the murder charge. Over defense counsel's objection, the prosecutor was allowed to question the accused on whether he had had sexual relations with a woman with whom he had been romantically linked. We held the

question was improper. We said the accused's right to limit his testimony does not vanish because there is "an incidental connection between" the charge as to which he elects to remain silent and "the crime concerning which he desires to speak." United States v Marymont, supra, page 751. The present case is substantially·different. There is not just an "incidental" connection between the question asked and the charges on which the accused elected to testify; there is, as Judge Kilday points out, a very "strong" relationship between the two.

The second point of difference between this case and *Marymont* is in the nature of the accused's testimony. In *Marymont*, we recognized that cross-examining the accused about the offense which he announced he would not testify to is nonetheless permitted if "the accused voluntarily extends his testimony to its allegations." *Id.* at page 751. Among the allegations of Charge II are, (1) that the accused had *knowledge* of attempts to induce him to reveal information contrary to the security and the best interests of the United States, and to cultivate him socially; and (2) that such attempts were by representatives of the Soviet Union and the German Democratic Republic. The accused testified at length about these allegations. Some of his testimony is as follows:

"Q: I'll ask you if, at any time during this period or any time while you have been in the military service, if you have discussed any matters of military affairs with anyone you have known to be either an East German or a Russian?

"A: No, sir.

• • • • •

"Q: Before I ask you about that, who accompanied you on this automobile trip? [to the house at which the accused was interrogated on September 29th].

"A: There were two civilians, plus one of these policemen. The civilians were in the front seat; I

---

[2] The accused maintained that the October 3d meeting was merely to continue the sight-seeing in East Berlin.

was in the back seat with the policeman.

"Q: Was there any conversation at that time which involved any matters of importance, either political or military subjects?

"A: There was no conversation at all.

. . . . .

"Q: All right. Now, on the morning of the 29th, what started the morning off?

"A: The morning was started off by them bringing me a continental breakfast, a great big pot of coffee, some rolls, and a little bit of meat. Then another individual arrived, a heavy-set individual.

"Q: How was he dressed?
"A: He was dressed in civilian attire.

"Q: Well, describe him, generally?
"A: As I recall, he had a sort of a tan—kind of a dark brown suit; he must have tipped the scales at about 235 pounds; about six feet tall; smoked cigars.

"Q: Did he identify himself?
"A: He just said that he was a major of philosophy.

. . . . .

"Q: At any time, up to the end of this day, had there been any disclosure to you of the nationality of any of these interviewers?

"A: No, there had not been.

"Q: All right. To make this clear, then, in all the conversations up to the present time, on any information or any inquiry by them, you gave no information which touched on the national defense of the United States of America?

"A: This is correct, sir.

. . . . .

"Q: Anybody contact you about disclosing any information?

"A: No, no one contacted me.

"Q: Would it be fair to say that that was just a tour, sightseeing around that area?

"A: Strictly.

. . . .

"Q: Did you . . . you did not get into any discussions that might have to do with the security of the United States?

"A: No."

It is obvious from the above extracts of the accused's testimony that he had no hesitancy about maintaining ignorance of the fact that the persons with whom he associated in East Germany were representatives of the two governments alleged in the specification. It is also obvious he had no hesitancy in disclaiming that he was asked for information contrary to the security and best interests of the United States. Thus, the accused testified at length about several elements of the offense charged. He simply refrained from saying specifically and directly that he did not report his contacts with the East German agents, as the regulation required. Having testified freely about some material elements of the offense, he could not, in my opinion, prevent cross-examination on the other elements of the same offense.

I have considered the other assignments of error, and I find nothing in them to justify setting aside the findings of guilty of Charges II and III. At trial, the law officer instructed the court-martial that for purposes of punishment it must consider Charge I and Charge III "as one offense." On review, the board of review held the instruction was "correct." It is doubtful, therefore, this Court's dismissal of Charge I would have any material effect on the reduced sentence approved by the board of review. However, the board of review may have attached somewhat greater opprobrium to the conspiracy charge than to Charge III. To give the accused the benefit of any doubt in that regard, I join Judge Kilday in returning the record of trial to the board of review for reassessment of the sentence.