UNITED STATES, Appellee,

v.

Staff Sergeant William J. SCHWAB, 526–80–7760, United States Army, Appellant.

ACMR 8702800.

U.S. Army Court of Military Review.

24 Oct. 1988.

For Appellant: Lieutenant Colonel Russell S. Estey, JAGC, Major Kathleen A. VanderBoom, JAGC, Captain Jeffrey J. Fleming, JAGC (on brief).

For Appellee: Colonel Norman G. Cooper, JAGC, Lieutenant Colonel Gary F. Roberson, JAGC, Captain Gary L. Hausken, JAGC, Captain Anne E. Ehrsam, JAGC (on brief).

Before COKER, KENNETT and BASHAM, Appellate Military Judges.

## OPINION OF THE COURT

### BASHAM, Judge:

Pursuant to his pleas, appellant was convicted by a military judge, sitting as a general court-martial, of failure to obey a lawful order and of wrongfully endeavoring to impede an investigation (two specifications), in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 934 (1982), respectively [hereinafter UCMJ]. He was also convicted, contrary to his plea, of conspiracy to commit larceny and wrongful sale of firearms, military property belonging to the United States, in violation of Article 81, UCMJ, 10 U.S.C. § 881, but acquitted, on the same specification, of conspiracy to commit murder. Appellant's adjudged sentence of a bad-conduct discharge, confinement for 18 months and reduction to the grade of Private E1 was approved by the convening authority.[1]

On appeal, appellant contends, *inter alia*, that the conviction of the conspiracy charge cannot stand because the evidence is insufficient to establish an overt act independent of and in furtherance of the agreement. We agree.

1. Appellant's guilty pleas were made pursuant to a pretrial agreement, but the sentence limitations binding the convening authority were to be triggered only if the appellant was acquitted of the conspiracy charge.

2. The question of stealing guns for money was apparently introduced by either Beverly or Williams, both of whom had been reading "Soldier of Fortune" and "Guns" magazines before meeting with appellant.

The facts, and the existence of at least a tentative plan to steal and sell 250 M16A1 rifles from an arms room, are not contested. Appellant was the supply sergeant for a basic training company and, in that capacity, became acquainted with Privates (PVT) Williams and Beverly when they were trainees in the same company. On the evening of 25 August 1987, appellant was the Battalion Staff Duty Noncommissioned Officer and Williams was his runner. At appellant's request, Beverly joined them around 2000 hours.

Appellant initiated a conversation by asking Beverly about the possibility of working as a driver for Beverly's uncle, whom Beverly had bragged had Mafia connections. The conversation then turned to the possibility of the three of them stealing a few Government weapons for sale to either Beverly's uncle or to an arms purchaser whom appellant claimed to know.[2] As the hours passed, the scheme evolved from obtaining a few weapons by taking them from a truck or a storage tent to removing 250 rifles from the arms room with the help of one of the unit armorers (a Sergeant (SGT) Brooks) and killing the armorer to throw off pursuit and to increase the profits of the other three. The session ended at 0100 hours the next morning with the parties agreeing to meet again.

Before going to sleep, Beverly jotted some notes describing the scheme. It contained a sketch and the observation "casualties 1" (an apparent reference to SGT Brooks).[3] Beverly, testifying pursuant to a grant of immunity, stated that he was a forgetful person. To counter that shortcoming, his mother had taught him to methodically make notes while events were fresh in his mind. That was the only reason that he made these notes. Neither of

3. Private Beverly testified that "[a]fter we discussed the money, and I had brought up the question about killing Sergeant Brooks, I asked Sergeant Schwab how he could kill his best friend, how he lay a price upon his friend's head, and Sergeant Schwab stated to me that friends come and go."

the other parties to the scheme knew of the existence of the notes.

Later that same day, PVT Williams, who was at the Criminal Investigation Detachment on other matters, volunteered a description of the scheme to steal the weapons.[4] The Special Agent he talked to did not advise him of his rights and urged him to talk again to appellant about the plan. Acting on those instructions, Williams did talk to appellant and described the conversation thusly: "I told him that I would need a certain amount of money to get ... weapons and he told me that that would be no problem because he had some put away."

The United States Code and Article 134, UCMJ, proscribe conspiracies which do not require an overt act, *see* 21 U.S.C. § 846; however, a criminal conspiracy pled under Article 81, UCMJ, requires "[t]hat, while the agreement continued to exist, and while the accused remained a party to the agreement, the accused or at least one of the coconspirators performed an overt act for the purpose of bringing about the object of the conspiracy." Manual For Courts–Martial, United States, 1984, Part IV, para. 5b(2).

The government theory of this case, which was adopted by the trial judge below, is that either the writing of the notes by Beverly, or the conversation between Williams and appellant constituted an overt act. We disagree and will treat the arguments in inverse order.

■ "The function of the overt act in a conspiracy prosecution is simply to manifest 'that the conspiracy is at work,' and is [not] a project still resting solely in the minds of the conspirators." *Yates v. United States*, 354 U.S. 298, 334, 77 S.Ct. 1064, 1085, 1 L.Ed.2d 1356 (1957) (citation omitted). While mere words may constitute an overt act under certain circumstances, *see United States v. Kidd*, 32 C.M.R. 184 (C.M.A.1962), they cannot do so when those words are part of the agreement. *United*

States v. Kauffman, 34 C.M.R. 63 (C.M.A. 1963). We believe that the conversation between Williams and appellant was no more than a continuation of the discussion of the plan they had contrived with Beverly. Certainly, to appellant, this appeared to be merely additional discussion as the parties had planned. All of the evidence is that the first "brainstorming" session terminated because of the late hour, not because the parties had settled on a final plan. Private Williams testified that "we all left with the idea in mind that we would discuss it at a later time, after the final details or the final points of the plan had been mulled over or thought about."

■ The government also argues that the statement by appellant that "I have some [money] put aside" is an admission that he had, subsequent to the meeting on 25 August, taken action to save or move money to buy weapons. Assuming that appellant's statement was true and not mere braggadocio, we find that the statement was ambiguous. It could have been simply a reference to savings in existence before 25 August and therefore cannot support a conviction. "As a matter of law, an act done by the conspirators prior to their agreement is not sufficient to constitute the overt act." *United States v. Farkas*, 21 M.J. 458, 460 (C.M.A.1986) (citation omitted).

■ The argument that Beverly's note-making constitutes an overt act is equally unconvincing. His making of notes and a sketch did nothing to advance the purposes of the purported agreement. Even if there was an agreement between the parties, there is no showing that this making of notes was "a subsequent act following a *complete* agreement or conspiracy, and done to carry into effect the object of the conspiracy." *United States v. Grossman*, 55 F.2d 408, 410 (E.D.N.Y.1931) (emphasis added). The evidence weighs against this being an act subsequent to a complete agreement in one other significant aspect.

---

4. These other matters involved appellant's fund raising efforts utilizing PVT Beverly and another soldier to sell candy bars and soft drinks to trainees in the field for as much as $5.00 each.

Hot drinks sold for $3.00 each and cold ones for $5.00. These acts were the basis for the Articles 92 and 134, UCMJ, offenses to which appellant pled guilty.

Beverly testified that the notes and sketch differed from the substance of the agreement when the three alleged coconspirators discussed their plan. Presumably, the notes were to form the basis of his interjection into future discussions.

The overt act is not merely an element of the offense of conspiracy. "[T]he underlying reason for proof of overt acts is to demonstrate that the conspiracy is alive and in motion." *United States v. Collier,* 14 M.J. 377, 380 (C.M.A.1983). If the act is ambiguous or the relationship between the act and the agreement is not demonstrable, it has no utility as circumstantial evidence in separating a group fantasy from a shared criminal intent. A clear delineation is necessary to avoid infringing on constitutionally protected rights. "[M]ere discussions susceptible of either an illegal or a legal interpretation" cannot support a conviction where the government must establish the existence of both an agreement and an overt act. *United States v. Wieschenberg,* 604 F.2d 326, 335 (5th Cir.1979).

Appellant's other allegation of error is without merit. The findings of guilty of Charge I and its specification are set aside and Charge I and its specification are dismissed. The remaining findings of guilty are affirmed. In accordance with the mandate of *United States v. Sales,* 22 M.J. 305 (C.M.A.1986), as well as Articles 59(a) and 66, UCMJ, 10 U.S.C. §§ 859(a), 866, we affirm only so much of the sentence as provides for a bad-conduct discharge, confinement for three months and reduction to the grade of Private El.

Senior Judge COKER and Judge KENNETT concur.